UNITED STATES, Appellee,

v.

Kenneth H. ROOKS, Specialist U.S. Army, Appellant.

No. 62,023.

CM 8801383.

U.S. Court of Military Appeals.

Nov. 20, 1989.

For appellant: *Major Marion E. Winter* and *Captain Pamela J. Dominisse.*

For appellee: *Major Daniel J. Dell'Orto, Major Gary L. Hausken,* and *Captain Randy V. Cargill.*

PER CURIAM:

On his pleas, Specialist Rooks was convicted of unauthorized absence, escape from confinement, and assault with a means likely to produce grievous bodily harm, in violation of Articles 86, 95, and 128, Uniform Code of Military Justice, 10 USC §§ 886, 895, and 928, respectively. In his petition to this Court, he contended for the first time [1] that the military judge should not have accepted his pleas to the last offense because his responses suggested matters substantially inconsistent with guilt. *See* Art. 45(a), UCMJ, 10 USC § 845(a). The issue we specified for review shifted the focus somewhat. It specifically asked whether the military judge erred when he failed to inquire further into appellant's mental responsibility in light of statements made by appellant during the providence inquiry.

The victims of the assaults were Rooks' estranged wife and his brother-in-law. During the providence inquiry, he informed

---

1. Represented by different appellate counsel in the Court of Military Review, appellant raised no specific issues in that court.

the military judge that he could not remember any of the details of the actual assault. He related that he and his wife had been having marital difficulties and that, under escort, he had gone to his on-post quarters to sign some papers related to a pending separation.[2] Appellant stated that he and his wife began a discussion of their problems. The crucial portion of his description of this event is best reproduced *in haec verba,* as follows:

MJ: You went to your house. Okay, what happened after you got there?

ACC: Yes, sir. I was escorted there by Sergeant Lee, to my quarters. My wife and I were discussing—while we were discussing about the separation and explaining to her all the things that were goin' on, that were causing a lot of problems at home.

Sir, we started discussing upstairs, she wanted to go downstairs where her brother and Sergeant Lee was. I went down, you know, into the kitchen. She followed me into the kitchen. Then I started explaining to her about the situations which were goin' on and trying to resolve this separation.

And explaining to her all the circumstances or the things that were goin' on. *I got a bad—a real bad headache, sir. While explaining I started getting real dizzy and shaky, sir, and next thing I heard my wife's—she became real blurry to my sight and I blacked out, sir.*

*The next thing I really knew, sir, you know, that I was hit on [the] head which I found out to be a lamp afterwards. And then when I was hit on the head, I looked—I had her brother by the neck, I let him go and then I jumped up and I said, "What's goin' on?" Everybody was scramblin' and screamin'.*

I seen the door was open and I ran outside the door. I looked back up at the door and my brother-in-law was standin' there sayin' I was dead. I had messed up. I'm gonna' get you for this. And I

really didn't know what had happened, sir.

(Emphasis added.)

Appellant's responses to the providence inquiry track closely with the symptoms of a seizure. The headaches, blurry vision, and loss of control and memory are classic indicia of such an episode. In fact, the behavior appears to be strikingly similar to what one legal/medical authority describes as the symptoms of an unusual form of seizure disorder, technically denominated hypothalmic epilepsy but more commonly called rage or furor epilepsy. In this type of epilepsy, a person has no control of his mental faculties but retains control of his motor skills. J. Schmidt, *Attorneys' Dictionary of Medicine* E–107 and H–171 (1988). In *People v. Higgins,* 5 N.Y.2d 607, 186 N.Y.S.2d 623, 159 N.E.2d 179 (1959), the New York Court of Appeals ordered a new trial in a contested case where the defendant offered evidence that he suffered from this disease. The description of that defendant's recollection of the events surrounding his offense seems to closely parallel Rooks' version in this case.

Along with most other jurisdictions, we have recognized that seizures attendant to epilepsy render an accused unable to form the *mens rea* required for conviction. *United States v. Johnson,* 3 USCMA 725, 730, 14 CMR 143, 148 (1954); *cf. State v. Welsh,* 8 Wash.App. 719, 508 P.2d 1041 (1973); *People v. Anderson,* 63 Cal.2d 351, 46 Cal.Rptr. 763, 406 P.2d 43 (1965); Anno. 27 ALR 4th 1067 (1984). The reason for this proposition is well stated in the discussion to section 2.01(1) and (2), *Model Penal Code and Commentaries* 212, 219 (1985): This condition is simply one which is not amenable to correction or to punishment. No societal interest is furthered by criminalizing acts committed in the throes of a seizure, where there is no control over one's reflexes.

The record here reflects that appellant had been examined by a sanity board prior to trial. However, there is no indication in

2. Rooks' commander had ordered him to stay away from his quarters.

the record that the possibility of epilepsy had been considered by the board. The record also discloses that a portion of appellant's medical records was missing at that time.

Moreover, no particular suggestion was made by anyone at trial that appellant's answers during the providence inquiry suggested that he suffered a seizure of some sort at the time of the attack on his wife and her brother.

 Ordinarily the providence of a plea of guilty is to be determined within the four corners of the record. *See United States v. Davenport,* 9 MJ 364 (CMA 1980). However, in an appropriate case, an appellate court should not hesitate to order a suitable additional inquiry. *See, e.g., Unit-*ed *States v. Stair,* 22 MJ 172 (CMA 1986). At the same time, we recognize that neither trial defense counsel nor appellate defense counsel before the Court of Military Review asserted this possible defense, so we are reluctant to rush to any conclusions at this level now.

Accordingly, we conclude that it is appropriate to remand the case to the Court of Military Review where that court can better inquire into this whole matter, either in its own proceedings or by directing other proceedings consistent with this opinion.

The decision of the United States Army Court of Military Review is set aside. The record of trial is returned to the Judge Advocate General of the Army for remand to that court for further consideration.