UNITED STATES, Appellee,

v.

**Michael H. ALLEN, Radioman, Senior Chief U.S. Navy (Ret.), Appellant.**

No. 65,293.
NMCM 88 1330R.

U.S. Court of Military Appeals.

Argued April 24, 1991.
Decided Sept. 18, 1991.

For Appellant: *R. Clayton Seaman, Jr., Esq.* (argued); *Major Joseph B. Gilbert, USMC* (on brief).

For Appellee: *Major Thomas D. Miller, USMC* (argued); *Commander Thomas W. Osborne, JAGC, USN* (on brief); *Lieutenant John J. Mulrooney, II, JAGC, USNR.*

*Opinion of the Court*

COX, Judge:

Contrary to his pleas, a general court-martial convicted appellant of disobeying regulations by copying and removing or communicating classified materials, and of espionage on behalf of the Government of the Republic of the Philippines, in violation of Articles 92, 106a, and 134, Uniform Code of Military Justice, 10 USC §§ 892, 906a, and 934, respectively.[1] The court-martial sentenced him to be confined for 8 years and to pay the United States a fine of $10,000.00. The convening authority approved the sentence and administratively reduced appellant to the lowest enlisted pay grade.[2]

The case was considered twice by the Court of Military Review. In its initial hearing, that court set aside the convening authority's action and returned the case for a new recommendation and action, specifically to determine whether the fine and reduction effected by operation of law were warranted. 28 MJ 610 (1989).

On further review the convening authority approved the sentence and again administratively reduced appellant to the lowest enlisted pay grade. The case was returned to the Court of Military Review, which considered it *en banc* and unanimously affirmed the findings and sentence. 31 MJ 572 (1990).[3]

We granted appellant's petition for review to determine whether: (1) unlawful command influence infected his trial; (2) the court below erred in concluding that the military judge was not disqualified and that denial of a witness was harmless; and (3) certain elements of the adjudged sentence were unlawful.[4]

1. Appellant was convicted of violating both Article 106a and the Federal Espionage Act, 18 USC § 793(d), as incorporated into the Code by the third clause of the General Article (Art. 134).

2. *See* Art. 58a, Uniform Code of Military Justice, 10 USC § 858a.

3. Chief Judge Byrne and Senior Judge McLeran recused themselves because of their participation in the case prior to assuming duties as appellate military judges.

4. The issues granted review were:

I
WHETHER THE EFFORTS OF SENIOR OFFICERS TO MANIPULATE THE DETAIL OF THE MILITARY JUDGE IN THIS CASE AMOUNTED TO UNLAWFUL COMMAND INFLUENCE.

II
WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERRED WHEN IT CONCLUDED THAT THE MILITARY JUDGE WAS NOT DISQUALIFIED BECAUSE OF HIS EX PARTE CONVERSATION WITH THE STAFF JUDGE ADVOCATE TO THE CONVENING AUTHORITY CONCERNING THE TRIAL BEFORE HIM.

III
WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERRED WHEN IT CONCLUDED THAT THE MILITARY JUDGE ABUSED HIS DISCRETION BY NOT ORDERING PRODUCTION OF CAPTAIN BYRNE AS A WITNESS BUT FURTHER FOUND THAT THE ERROR WAS HARMLESS BEYOND A REASONABLE DOUBT.

IV
WHETHER THE FAILURE TO PAY RMCS ALLEN WHILE HE WAS IN PRETRIAL CONFINEMENT CONSTITUTES A VIOLATION OF ARTICLE 13, UCMJ.

V
WHETHER THE GOVERNMENT ACTED IN EXCESS OF ITS JURISDICTION BY DEPRIVING THE ACCUSED OF HIS PAY PRIOR TO THE CONVENING AUTHORITY TAKING HIS ACTION ON THIS CASE.

## I

The background of this case and many of the salient facts may be found in the decision of the Court of Military Review. 31 MJ at 582–83, 596–98. We shall not repeat those facts except as required to resolve the granted issues.

Much of the controversy before us concerns assignment of military judges to this case. Interrogatories put to the then Chief Judge of the Navy–Marine Corps Trial Judiciary, Captain Edward M. Byrne, JAGC, USN, provided many of the facts on which the issue has been litigated. In his answers, Judge Byrne stated that, during the last week of January 1987, he received a telephone call from the then-Deputy Judge Advocate General of the Navy, Rear Admiral Richard Slater, concerning the case. The answer to one interrogatory relates that, during the conversation,

> Rear Admiral Slater stated something to the effect that the circuit planned to detail Captain Reed to the case but that Captain Powell [5] was concerned, because, while Captain Reed was a fine military judge and exceptional officer, he [w]as a light sentencer.

Judge Byrne further stated that he "was distracted by great irritation" by the call from Rear Admiral Slater and "considered it highly inappropriate."

At the time, Judge Byrne was developing "a plan to handle ... [the] SCI/national security cases which were arising worldwide." In prior practice only one member of the Navy–Marine Corps Trial Judiciary was cleared for, and given access to, sensitive compartmented information (SCI) materials, due to the cost of the investigations required for that access. The military judge who had been so cleared had announced his retirement, and Chief Judge Byrne had initiated a request to have Cap-

tain Philip F. Roberts, JAGC, USN, succeed him. A number of similar trials were pending in the Naval Service at the time and replacement of the retiring judge was becoming critical.

Chief Judge Byrne also was pressing for specific authority to detail judges as required to ensure the best use of personnel assets. Shortly thereafter he received that authority from the Acting Secretary of the Navy and wrote an instruction to implement the practice. He then detailed Judge Roberts to the four pending national security cases, including this trial, and designated two other judges as back-ups should conflicts occur.

As this case progressed, it became clear that scheduling conflicts would prevent Judge Roberts from sitting on all the pending security cases. He was relieved from this case and detailed to a trial in Quantico, Virginia. Chief Judge Byrne consulted with Judge Donato and, on his recommendation, detailed Judge Reed to this case.[6]

At trial, Captain Powell testified that he had telephoned Rear Admiral Slater about this case. In the course of the conversation, Captain Powell told Rear Admiral Slater that he believed that the Circuit Judge, Judge Donato, was planning to detail Judge Reed to the case. Captain Powell stated that he informed Rear Admiral Slater of the local perception "that Judge Reed was a light sentencer" and pro-defense.

Judge Donato testified that he, too, discussed the detail of a judge for this case with Chief Judge Byrne. He stated he told the Chief Judge that the detail of Judge Roberts was unnecessary as he believed the circuit work load was manageable and Judge Reed "was capable of handling the

---

In addition we specified the following issue:

VI

WHETHER AS A RETIRED MEMBER APPELLANT MAY BE LAWFULLY REDUCED IN RANK EITHER BY THE COURT–MARTIAL OR BY OPERATION OF LAW AS A RESULT OF HIS CONVICTION WHERE HIS OFFENSES WERE NOT COMMITTED DURING A PERIOD OF ACTIVE DUTY.

5. Staff Judge Advocate to the convening authority.

6. In his answers to the interrogatories, Chief Judge Byrne admitted that he believed that the detail of Judge Reed "would remove an area of potential litigation" from the case.

case." He also testified that he was aware of the criticism of sentences in his circuit.

Also connected with the question whether the detail of Judge Reed was somehow manipulated in response to outside influences, there is evidence of pressure from a number of senior judge advocates to have the Judge Advocate General of the Navy give some attention to the Southwest Judicial Circuit where this case was to be tried. Prior to the 1987 Pacific Area Commander's Conference (PACOM), senior Navy lawyers held a "mini-conference" under the direction of Captain Morris Sinor, Staff Judge Advocate to the Commander–In–Chief, Pacific Fleet. At one session the conferees discussed "Problems in the Judiciary."

The same officers met with the Judge Advocate General, Rear Admiral Campbell, to discuss a number of issues, including an agenda item entitled "Problem Judges." In stipulated testimony Captain Sinor stated that he believed it "necessary to raise the" problem with the Judge Advocate General because of a number of cases from the Southwest Circuit where he believed the actions of the judges were "inappropriate." One of his purposes was to encourage the Judge Advocate General "to institute some sort of review" of judges' performance. However, according to Captain Sinor, Rear Admiral Campbell refused to discuss the matter and told him he would not undertake such a program.

The essence of appellant's argument in this case is that the selection of the military judge was so tainted by apparent attempts of senior officers of the Judge Advocate General's Corps of the Navy to manipulate the process as to undermine confidence in the result of the trial. Appellant further argues that the rulings of Judge Reed demonstrate the impact of these efforts on the trial itself. However, a review of the record supports neither of these arguments.

■ There is no doubt that the appearance of unlawful command influence is as devastating to the military justice system as the actual manipulation of any given trial. *Cf. United States v. Cruz*, 25 MJ 326 (CMA 1987). However, there must be something more than an appearance of evil to justify action by an appellate court in a particular case. "Proof of [command influence] in the air, so to speak, will not do." [7] We will not presume that a military judge has been influenced simply by the proximity of events which give the appearance of command influence in the absence of a connection to the result of a particular trial. *United States v. Thomas*, 22 MJ 388, 396 (CMA 1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987); *see also United States v. Levite*, 25 MJ 334, 341 (CMA 1987) (Cox, J., concurring).

In this case, it is apparent that command influence did not prejudice any judicial rulings. Judge Roberts heard two motions before being replaced by Judge Reed. The first sought funds for the defense team to travel to the Western Pacific Area, which he granted. The second sought relief from the conditions of pretrial confinement, which was denied. When it was relitigated before Judge Reed, it was again denied. The rulings of Judge Reed have been reviewed by the Court of Military Review and evaluated in appellant's petition for grant of review, and they have been found not to warrant relief.

Assuming that the actions of the senior officers amounted to an attempt to influence the detail of the military judge and thus unlawfully manipulate the result of this trial, it is clear that it failed. Judge Reed, of course, sat as the military judge. Further, with the exception of one issue, he was not even aware of these matters until the issue was raised before him at trial. Therefore, we are satisfied beyond a reasonable doubt that neither the criticism of sentences adjudged by him nor the attempt to prevent him from sitting in this case caused him to violate his oath to perform

7. The quote is often attributed to then-Chief Judge Cardozo and appears in his opinion in *Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339, 341, 162 N.E. 99 (1928). However, Judge Cardozo was actually quoting from Pollock, *Torts*, 455 (11th ed.). *See* W. Prosser, J. Wade, and V. Schwartz, *Cases and Materials on Torts* 304 (8th ed. 1988).

his duties in an impartial manner. *See United States v. Thomas, supra* at 396. Appellant's assertions of unlawful command influence in this case must fail.

## II

■ Our second granted issue concerns an *ex parte* communication from Captain Powell, the Staff Judge Advocate to the convening authority, to Judge Reed. This communication arose when Judge Reed was reviewing the interrogatories sent to Chief Judge Byrne. Noting that one of the interrogatories asked if there had been any communications between himself and Captain Powell, he stated that he believed that he should disclose a telephone conversation regarding the cost of trying the case and, in particular the delays involved. Judge Reed informed counsel that he had told Captain Powell that those concerns were more properly addressed to the convening authority and that he (Judge Reed) "would look to the trial counsel ... to represent the interests of the" United States in such matters.[8]

During an ensuing hearing, Captain Powell was called as a witness and testified that he had discussed this case with Judge Reed. However, he stated that this conversation was limited to a statement that he wished Judge Reed would keep the trial on-track once it was scheduled because of the expense of the trial. His stated concern was the fact that the witness fees would be large as most of the individuals were not in the general area and would have to be flown in to testify. Captain Powell testified that Judge Reed told him to make sure the trial counsel understood the problem. He also admitted that he, not Judge Reed, had initiated the conversation.

Following Captain Powell's testimony, the military judge invited *voir dire* on the subject. He again stated that the only matter discussed was Captain Powell's concern over the cost of the trial; that his response was that such issues were more properly the province of the trial counsel; and that he then ended the conversation.

Finally, Judge Reed stated that Captain Powell's testimony was "substantially" consistent with his memory of the conversation.

We agree with Senior Judge Albertson of the Court of Military Review that this telephone conversation was clearly "inappropriate" and that Judge Reed handled the matter correctly by terminating the conversation and reminding Captain Powell to address such concerns to trial counsel. Further, by informing the parties and allowing *voir dire* on the issue, Judge Reed eliminated the possibility of creating the misperception that he might not be impartial. *See* 31 MJ at 602-03.

However, an additional issue must be resolved here: whether this episode disqualified Judge Reed by making him a witness in the proceedings. RCM 902(b)(1) and (b)(3), Manual for Courts-Martial, United States, 1984.

A judge becomes a witness when he has "personal knowledge of disputed evidentiary facts concerning the proceeding." RCM 902(b)(1). The court below determined that Judge Reed did not receive this information in an extrajudicial capacity and, thus, was not disqualified. 31 MJ at 603, *citing United States v. Patrick,* 542 F.2d 381 (7th Cir.1976), *cert. denied,* 430 U.S. 981, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977). However, we need not decide how Judge Reed came to possess the information. Rather, the question is whether Judge Reed used this knowledge to arrive at his findings on the issue of unlawful command influence.

Captain Powell testified as to the subject of the conversation, and the substance of his testimony was not disputed by appellant. His credibility as to whether the call was made was not in dispute. Thus, Judge Reed was not called upon to use his knowledge of the conversation and was not disqualified. *Cf. United States v. Bradley,* 7 MJ 332, 334 (CMA 1979), *citing United States v. Hodges,* 22 USCMA 506, 47 CMR 923 (1973).

8. Judge Reed's disclosure is set forth *in haec verba* at 599-600 of 31 MJ.

## III

■ We next address the Court of Military Review's conclusion that refusal to call Chief Judge Byrne as a witness was harmless error. As mentioned, appellant sought Chief Judge Byrne as a witness on the issue of command influence. Judge Reed denied this request, over objection from defense counsel, and ordered the parties to stipulate that the interrogatories represented the substance of his testimony.

The answers contained in the interrogatories were strong evidence of an attempt to exercise unlawful command control, particularly the disclosure that Rear Admiral Slater at least implicitly attempted to influence Chief Judge Byrne's detail of the military judge in this case. In fact the court below found that the interrogatories were themselves sufficient to raise the issue of unlawful command control of this trial. 31 MJ at 617. Therefore, appellant was not deprived of the ability to present his case because he was forced to use the interrogatories as evidence rather than a live witness. Left unanswered is the question whether appellant suffered substantial prejudice by the lack of a personal appearance by Chief Judge Byrne.

We believe, as did the Court of Military Review, that prejudice must be calculated from the totality of the circumstances. *United States v. Lucas*, 5 MJ 167, 171–73 (CMA 1978). The truthfulness of the answers to the questions surrounding the telephone conversation between Judge Byrne and Rear Admiral Slater is not in doubt. Further, the interrogatories were not the only evidence on the subject. Captain Powell, who initiated the telephone call to Rear Admiral Slater, testified in person about the call and his motivations, thus corroborating the veracity of the answers.

Finally, appellant has offered nothing beyond speculation as to the impact the personal appearance of Chief Judge Byrne would have had on this case.

This is not a situation where the accused is seeking to have a face-to-face confrontation with his accuser. *Cf. Idaho v. Wright,* ⸺ U.S. ⸺, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Rather, this is an interlocutory matter which, although important to the prosecution, was not dispositive thereof.[9] Finally, whatever may have been intended by the telephone call, it ultimately had no effect as Judge Reed was detailed by Chief Judge Byrne. Taking into account all the circumstances, there appears no possibility that the personal appearance of Chief Judge Byrne would "have tipped the balance in favor of" appellant. *United States v. Lucas, supra* at 172; *see also Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Thus, we, too, are satisfied beyond a reasonable doubt that appellant did not suffer substantial prejudice from the failure to produce Chief Judge Byrne to testify in person. *Cf. Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

## IV

■ Appellant complains that, because he was not paid the full pay and allowances of a senior chief petty officer while confined awaiting trial, he has suffered pretrial punishment in violation of Article 13 of the Code, 10 USC § 813.[10] Our analysis leads us to conclude otherwise.

Article 13 protects an accused from imposition of unduly onerous conditions of pretrial restraint, as well as from any other form of punishment prior to trial. *United States v. Villamil–Perez*, 32 MJ 341 (CMA

---

9. While we need not decide the question, it is possible that, even if command influence had been found to be present in the detail of the military judge, it might have been possible to remove the taint. Among the remedies which come to mind are the detail of a judge from a sister service or the recall of a retired judge to active duty.

10. In pertinent part, Article 13 provides:

No person, while being held for trial, may be subjected to punishment or penalty other than arrest or confinement upon the charges pending against him, nor shall the arrest or confinement imposed upon him be any more rigorous than the circumstances required to insure his presence, but he may be subjected to minor punishment during that period for infractions of discipline.

1991); *United States v. Cruz,* 25 MJ 326. If appellant can establish that he was deprived of some right or privilege beyond those necessary to insure his presence for trial, a valid claim of pretrial punishment will lie.

Appellant argues that he was in a "full duty" status after being placed in pretrial confinement and as such was entitled to regular military compensation. However, appellant's compensation, and that of all servicemembers (and indeed our own) is set by statute. A retired servicemember, not on active duty, is entitled only to retired pay. 10 USC §§ 1401–08. Appellant was not recalled to active duty for the purpose of this trial. Rather, he was tried as a retired member under Article 2(a)(4), UCMJ, 10 USC § 802(a)(4).[11] His service in confinement while awaiting his court-martial was compensable only at the rate for retired members. As a consequence, he did not suffer pretrial punishment.

## V

■ Because appellant was convicted of violating the Federal Espionage Act, 18 USC § 793(d), his pay became subject to forfeiture under 5 USC § 8312, an action collateral to this proceeding. Within 1 week of the announcement of sentence in this case, action was taken by officials of the Naval Service to terminate his pay pursuant to that statute. The forfeiture was approved shortly thereafter, about 5 months before the convening authority took the initial action on the record.

Appellant argues that the action was premature in that the statute authorizes forfeiture only following conviction. He argues that "conviction" in military law occurs only when the convening authority approves the findings. *See Dunlap v. Convening Authority,* 23 USCMA 135, 137, 48 CMR 751, 753 (1974), *overruled,*

*United States v. Banks,* 7 MJ 92 (CMA 1979). Thus, in his view the forfeiture could be effected only after the action of the convening authority.[12]

Although for some purposes, a military member is "convicted" after he has been sentenced, we agree with appellant that in military practice the results of a trial do not become final until the convening authority has acted. Art. 57(b), UCMJ, 10 USC § 857(b); *see* Mil.R.Evid 609(b), Manual, *supra. Cf. United States v. Hernandez,* 33 MJ 127 (CMA 1991). However, the power of an appellate court in the military justice system is limited to correcting illegal sentences or the execution thereof. *See United States v. Dienst,* 16 MJ 727 (AFCMR 1983), *pet. denied,* 18 MJ 28 (CMA 1984). Because the action taken to terminate appellant's pay was collateral to these proceedings, it was not part of his sentence and thus was beyond the grant of power in Article 67, UCMJ, 10 USC § 867. *Compare Keys v. Cole* 31 MJ 228 (CMA 1990), *with United States v. Olson,* 25 MJ 293 (CMA 1987).

Whatever may be the merits of appellant's argument, under these circumstances we have no power to order return of his pay. In the Tucker Act, 28 § 1491 (1982), Congress made such matters exclusively the province of the United States Claims Court or, where appropriate, the Federal District Courts, 28 USC § 1346. *Cf. Bell v. United States,* 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961). We have recently reaffirmed our position that such claims must be placed before those fora in view of their particular expertise in dealing with claims for pay. *Keys v. Cole, supra; accord* B–189465, 57 Comp.Gen. 132 (1977) (decisions of United States Court of Military Appeals strictly limited to matters of military justice and do not extend to status

---

11. In point of fact, the Secretary of the Navy has prohibited the recall to active duty of retired members for trial. *See* 0116c(5), Manual of the Judge Advocate General of the Navy (Change 6, 22 Apr.1987).

12. Logically, appellant's argument would mandate the return of all pay forfeited (a considerable sum) before the second convening authority's action following the initial decision of the *Court of Military Review which set aside the initial action on the record.* 28 MJ 610, 613 (1989).

of servicemember's pay). Accordingly, our authority in this area is limited to deciding—and we do so hold—that, under the Uniform Code of Military Justice, appellant was not "convicted" of violating the Federal Espionage Act until the convening authority here took his action. It is for another Federal court, however, to decide whether, in light of our holding, appellant's pay was withheld prematurely. Thus, appellant must seek relief elsewhere.

## VI

■ Finally, we consider whether appellant should be reduced in rate by operation of law under Article 58a, UCMJ, 10 USC § 858a. As the Government notes, the historic practice of the Army (and the Air Force) was to reduce a noncommissioned officer to the ranks following a conviction, because the retention in the higher grade was deemed to undermine the status of the noncommissioned officer corps. W.Winthrop, *Military Law and Precedents* 431 (2d ed. 1920 Reprint). This remains the practice in the Army and Air Force, extending even to the reduction of those members who are administratively separated for reasons of misconduct. *See* paras. 1–14 and 6–11, Army Regulation 635–200 (Oct.1984).

Such was not the tradition of the sea services, however. In fact the Secretary of the Navy exempted the Naval Service from the automatic reduction directed by paragraph 126e, Manual for Courts–Martial, United States, 1951. *See* § 0122, Naval Supplement to the Manual for Courts–Martial, United States, 1951 (Change 3); *United States v. Castner,* 3 USCMA 466, 467–68, 13 CMR 22, 23–24 (1953). He continued this practice for some years after Congress enacted Article 58a of the Code. *See United States v. Cabral,* 20 MJ 269, 272 (CMA 1985).

The parties have focused on the sections of the United States Code defining those persons who are "members." [13] Those statutes do limit the jurisdiction of a court-martial over an accused. However, there is no doubt of the power of a court-martial to try a person receiving retired pay. *Pearson v. Bloss,* 28 MJ 376 (CMA 1989); *accord United States v. Overton,* 24 MJ 309 (CMA), *cert. denied,* 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987). Therefore, they are not instructive as to the issue specified. Rather, we are concerned about the nature and types of punishment such a tribunal may impose.

We are not the first to consider this proposition. Writing at a time when the entire question of the power of courts-martial over retirees and reservists was subject to considerable debate, Professor Bishop concluded that forfeiture of pay (and by analogy reduction) was not necessary to satisfy the military interests in those cases. Bishop, *Court–Martial Jurisdiction Over Military–Civilian Hybrids: Retired Regulars, Reservists, and Discharged Prisoners,* 112 U.Pa.L.Rev. 317, 356–57 (1964). This is consistent with the long-standing proposition that a transfer of a servicemember to the retired list is conclusive in all aspects as to grade and rate of pay based on his years of service. 10 USC § 6332. Further, the Comptroller General has held that a member of the Fleet Reserve (legally, an almost identical status [14]) who was court-martialed during a period of active duty and reduced in rating was to be paid at the higher rate once he returned to inactive duty. B–10520, 20 Comp.Gen. 76, 78 (1940); *see also* A–32599, 10 Comp.Gen. 37 (1930). From this we conclude that, because appellant was tried as a retired member, he could not be reduced for these offenses either by the court-martial or by operation of Article 58a.

---

**13.** Appellant's brief erroneously asserts that he was retired under 10 USC § 1331, the statute establishing the payment of reserve annuities. Instead, appellant was successively transferred to the Fleet Reserve and then to the retired list of the Regular Navy, pursuant to 10 USC §§ 6330(b) and 6331(a)(1), respectively.

**14.** *United States v. Overton,* 24 MJ 309 (CMA), *cert. denied,* 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987).

The decision of the United States Navy-Marine Corps Court of Military Review is affirmed. That portion of the convening authority's action which purports to reduce appellant to the lowest enlisted grade is set aside. All rights, privileges, and property of which appellant has been deprived by virtue of that action are hereby ordered restored.

Chief Judge SULLIVAN concurs.

EVERETT, Senior Judge (concurring):

I write for two purposes. The first is to emphasize that, although I have joined in affirming the findings both in this case and in *United States v. Mabe*, 33 MJ 232 (CMA 1991), I am deeply concerned by the apparent efforts to exercise command influence over military judges. The circumstance that commanders and others who are dissatisfied with court-martial results have attempted to enlist the Chief Military Judge of the Navy in the effort to obtain "reform" is appalling. However, I have concluded that, just as admission of evidence of a coerced confession does not always mandate reversal of a conviction, *Arizona v. Fulminante*, — U.S. —, 111 S.Ct. 1246, 1263–66, 113 L.Ed.2d 302 (1991), so, too, the draconian remedy of dismissing the Charges is not required either here or in *Mabe*.

Secondly, I would qualify some of the majority's language concerning the authority of this Court—or the Court of Military Review—to deal with military pay questions. In my view, as long as the issue concerning a servicemember's pay arises as a result of, or in connection with, a court-martial proceeding, this Court is empowered to decide whatever issue must be decided in order to assure that the accused receives the relief to which he is entitled under the Uniform Code of Military Justice. However, as a matter of sound judicial administration and in recognition of our Court's relative lack of expertise in military pay matters, we should abstain from deciding collateral military pay issues unless, by refraining, we would irreparably harm the accused. With this principle of abstention in mind—and being unable to discern here any extraordinary circumstances that would warrant a contrary result—I conclude that in this case—as in *Keys v. Cole*, 31 MJ 228 (CMA 1990)—the effects of our decision on the accused's military pay can best be determined in the United States Claims Court.