UNITED STATES, Appellee

v.

Otto A. CAMPOS, Private First
Class, U.S. Army, Appellant.

No. 93–1465.
CMR No. 9102015.

U.S. Court of Appeals for
the Armed Forces.

Argued Nov. 10, 1994.

Decided Aug. 23, 1995.

For Appellant: *Major Michael A. Egan* (argued); *Colonel Stephen D. Smith* and *Lieutenant Colonel James H. Weise* (on brief); *Major Roy D. Hewitt* and *Captain Michael E. Smith*.

For Appellee: *Captain J. Key Schoen* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel James L. Pohl, Captain Gregory T. Baldwin, Captain Joel B. Miller* (on brief); *Colonel John M. Smith, Major Kenneth T. Grant, Captain Jane F. Polcen, Captain Anthony P. Nicastro*.

*Opinion of the Court*

WISS, Judge:

1. Notwithstanding not-guilty pleas, a military judge sitting alone as a general court-martial at Fort Hood, Texas, convicted appellant of willful disobedience of a noncommissioned officer, assaulting a noncommissioned officer in the execution of his duties, and aggravated assault, *see* Arts. 91 and 128, Uniform Code of Military Justice, 10 USC §§ 891 and 928, respectively. Appellant's sentence extended to a bad-conduct dis-

1. *See* 41 MJ 213, 229 n. * (1994).

charge, confinement and forfeiture of $250.00 pay per month for 4 months, and reduction to the lowest enlisted grade. The convening authority approved these results, and the Court of Military Review[1] affirmed. 37 MJ 894 (1993).

2. On appellant's petition, we granted review of the following issues:

I

WHETHER THE EVIDENCE IS LEGALLY AND FACTUALLY INSUFFICIENT TO CONVICT APPELLANT OF THE CHARGED OFFENSES BECAUSE HE LACKED THE REQUIRED *MENS REA* DUE TO AUTOMATIC AND UNCONTROLLABLE BEHAVIOR BROUGHT ON BY CLAUSTROPHOBIA.

II

WHETHER THE MILITARY JUDGE IN THIS CASE WAS SUBJECTED TO UNLAWFUL COMMAND INFLUENCE BECAUSE OF HIS PERCEIVED DEMOTION DUE TO HIS LENIENT SENTENCING PHILOSOPHY, AND THE CORRESPONDING GENERAL PERCEPTION THAT A SENIOR JUDGE HAD BEEN ASSIGNED TO FORT HOOD BECAUSE OF THE SENIOR JUDGE'S HARSH SENTENCING PHILOSOPHY.

III

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY DENYING APPELLANT'S MOTION FOR THE PRODUCTION OF FIVE WITNESSES WHOSE TESTIMONY WAS CRITICAL TO A DETERMINATION OF THE ISSUE OF UNLAWFUL COMMAND INFLUENCE AND FORCING THE DEFENSE TO ENTER INTO STIPULATIONS OF EXPECTED TESTIMONY.

## IV

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY FAILING TO SUA SPONTE RECUSE HIMSELF FROM APPELLANT'S COURT–MARTIAL BECAUSE OF: 1) HIS PERSONAL FEELINGS ABOUT BEING REPLACED BY COLONEL GREEN AS THE SENIOR MILITARY JUDGE AT FORT HOOD; 2) HIS PERSONAL KNOWLEDGE OF THE FACTS RELATING TO APPELLANT'S ALLEGATION OF UNLAWFUL COMMAND INFLUENCE; AND 3) THE FACT THAT HE WAS CALLED UPON TO RULE ON THE CORRECTNESS OF HIS OWN PRIOR RULING THAT UNLAWFUL COMMAND INFLUENCE HAD NOT INFECTED APPELLANT'S COURT–MARTIAL.

3. Now, after full consideration of appellant's complaints, we hold: As to Issue I, the evidence is legally sufficient to support the findings of guilt; as to Issue II, the military judge was not subjected to any unlawful command influence, in fact or in appearance; as to Issue III, the military judge did not abuse his discretion under the circumstances of this case in denying the defense request for witnesses and relying instead on stipulations of their expected testimony; and, as to Issue IV, the military judge did not err in not recusing himself *sua sponte.*

## I

### A

4. On February 5, 1991, appellant's unit was on a training mission in Saudi Arabia during Operation Desert Storm. Appellant was riding in a Bradley Fighting Vehicle. The exercise required appellant to dismount, so Sergeant Han, his squad leader, ordered him to remove his Combat Vehicle Crew (CVC) helmet and to put on his kevlar helmet. Appellant complied; however, several minutes into the exercise, he put his CVC helmet back on because the vehicle noise (which that helmet mostly kept out) was causing him to have a panic attack. When Sergeant Han again ordered appellant to wear his kevlar helmet, appellant refused to remove his CVC helmet and attacked Han. After a short struggle, appellant exited the rear hatch/ramp of the vehicle and discarded his equipment in the desert. *See* Final Brief at 2–3; Answer to Final Brief at 2–3.

5. Shortly after this incident, the division psychiatrist, Captain Engel, examined appellant and concluded that he suffered from "combat stress reaction, moderate." In a memorandum to appellant's command dated February 8, Captain Engel indicated that appellant had described to him "episodes of panic when in Bradley Fighting Vehicles" and that "the onset of these attacks occurred about 3 months ago." In his discussion of this condition, Captain Engel wrote:

a. This soldier's panic attacks are the result of increased stress due to possible combat. This is a normal reaction to a very stressful set of circumstances called a combat stress reaction.

b. Combat stress is not a medical illness. No medical board or evacuation is necessary or indicated.

c. During this soldier's stay on our holding area, he was instructed extensively on the use of relaxation techniques. He should perform them at least once each day.

d. This soldier does, when under stress, have difficulty dealing with confined spaces. He is likely to perform better as a soldier if his job does not call for extended periods in small spaces.

e. This soldier is responsible for his actions. He is medically cleared for any administrative or judicial actions deemed appropriate by command.

6. Appellant's command apparently made some effort to follow Captain Engel's recommendation concerning his duties. However, on February 12, appellant was ordered to mount his Bradley vehicle to participate in a training mission with his unit. Appellant repeatedly refused to do so. First Sergeant Chamberlain ordered appellant into a HMMWV (high mobility multi-purpose wheeled vehicle) because the battalion was moving out, and Chamberlain "started chew-

ing his butt." When appellant began fiddling with his bayonet, Chamberlain ordered him to put it down. In response, appellant growled, "I'm going to kill you," and lunged forward to stab Chamberlain. Other soldiers intervened and restrained appellant.

7. As a consequence of these actions, the instant charges were preferred against appellant, and a sanity board convened on July 11, 1991, to examine him. By memorandum dated July 29, the board defined "automatic" behavior, which it concluded had played a role in appellant's attacks, and then opined the degree to which it affected appellant's control. The results of this board were made known at trial, and all three members of the board appeared as witnesses.

8. First, Captain Engel—who, it will be recalled, had seen appellant immediately after the first incident—testified that, while his initial diagnosis of appellant was combat stress reaction or simple phobia, he had changed his diagnosis to panic disorder when serving on appellant's sanity board. He explained that he believed that appellant's condition had worsened in the 5 months between the incidents and the convening of the sanity board. Nonetheless, he concluded that, at the time of the incidents, "automatic behavior was a factor" in appellant's actions.

9. "Automatic" behavior, Captain Engel explained, was "[s]omething to which the individual has a limited degree of control." Later, he clarified this comment as follows:

> You know, I would—I think it's important to say that on some level—you know, there is—how he avoids that anxiety is a matter of choice for him. And I'm not trying to make the point that he's totally without volition, totally without responsibility. But, merely that, you know, that this was a choice that he made as a way of avoiding the anxiety provoking situation that had suddenly become out of control for him. Somebody else might've chose [sic] a different route.

Under questioning by the military judge, Captain Engel amplified his views thusly:

> [A]lthough he was aware of what was right and what was wrong, legally, and in his own mind, morally, . . . his ability to actu-

ally respond in a way that he might normally do, was diminished. He was being driven to a large extent by his symptoms more so than what he knew was right and what was wrong.

10. Major Orman, Chief of Psychiatry at Fort Hood and also a member of appellant's sanity board, testified that, during the confrontations in question, appellant was engaged in automatic behavior and that any intent at that time would be an intent "to avoid or get away from the stimulus" of the panic. When asked what was the sanity board's diagnosis of appellant, Major Orman responded: "Diagnos[e]s that are relevant under DSMR3, the diagnosis at the time of the incidents was simple phobia, and the current diagnosis is panic disorder." He distinguished between the two maladies as follows: "Panic disorder is where you can have very severe anxiety symptoms, and there doesn't have to be a specific stimulus any more," whereas phobia is triggered by a specific stimulus.

11. Trial counsel and defense counsel both tried to press Major Orman about appellant's "intent" when he attacked his victims, especially during the second event in which there had been some evidence that appellant had experienced what was called a blackout. It was clear that Major Orman was uncomfortable answering these questions in the context in which they were asked. Instead, at one point, he offered "the analogy of the alcoholic. The alcoholic may be doing very purposeful behaviors while they are in the midst of a black out, and then when [they] finally sober up, have absolutely no recollection of what they did."

12. He answered affirmatively to the military judge's questions whether any of the various terms that had been used—e.g., phobia, panic disorder, combat stress reaction— "could . . . constitute a mental disease or defect" or "could . . . be so severe that the accused would be unable to appreciate the nature or the quality of what he was doing at that time." Orman opined that, during an attack, appellant would not know right from wrong. He reiterated, however, that he believed that at the time of the offenses, appel-

lant was suffering from a simple phobia and did not then have a panic disorder.

13. Finally, former-Captain Rudd, the third member of the sanity board, concurred with the diagnosis. He testified that, if someone with that condition were to be prevented from escaping the source of the anxiety, the normal reaction would be to fight back and resist anyone who tried to block him. Under questioning by the military judge, Dr. Rudd acknowledged that, except during an "acute phase" of a panic attack, a person would be aware of an order to do something; during the "acute phase, there's a limited ability to respond."

### B

14. The evidence thus summarized was offered by the defense as rebuttal to the prosecution's evidence of criminal *mens rea* underlying appellant's offenses, which the Government was required to prove beyond a reasonable doubt. Appellant specifically did "not claim[ ] insanity or anything like it." Rather, defense counsel expressly represented to the military judge: "[W]hat we are doing is introducing evidence, which on its face, rebuts whatever minute inference of intent could come from the Government's case in chief." *See United States v. Rooks*, 29 MJ 291 (CMA 1989); *Ellis v. Jacob*, 26 MJ 90 (CMA 1988).

15. As reflected in the findings of guilty, however, appellant failed in his rebuttal effort in the view of the military judge as the factfinder. Now, upon this record, appellant asks this Court to find, nonetheless, that the evidence is not sufficient upon which any rational factfinder could have found beyond a reasonable doubt that he possessed the required *mens rea* for the charged offenses. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Turner*, 25 MJ 324 (CMA 1987). In this context, the evidence is to be viewed in the light most favorable to the prosecution. *Id.* In that light, we disagree.

16. The psychological evidence before the factfinder, relied upon by the defense, was far from concrete or consistent. When he saw appellant during the few days between the two offenses, Captain Engel diagnosed appellant as having experienced a *"normal reaction* to a very stressful set of circumstances" but *"responsible* for his actions." (Emphasis added.) In his trial testimony, Captain Engel diagnosed appellant as having a simple phobia at the time of the offenses, which subsequently had advanced to a panic disorder. He adhered to the sanity board's conclusion that "automatic behavior" in response to anxiety had been a factor in appellant's conduct, but then he acknowledged his view that "how [appellant] avoids that anxiety is *a matter of choice for him.....* I'm *not* trying to make the point that he's *totally without volition, totally without responsibility.* But, merely that, you know, that this was *a choice* that he made as a way of avoiding the anxiety...." (Emphasis added.)

17. For his part, Major Orman testified that appellant's "intent" during "automatic behavior" would be *"to avoid or get away from the stimulus"* of his panic. (Emphasis added.) Later, though, he opined that during an attack, appellant *would not know right from wrong*—yet immediately thereafter affirmed his earlier position that, at the time of the incidents, appellant had been suffering only from a *simple phobia.*

18. As for Doctor Rudd, he acknowledged that, except during an "acute phase" of a panic attack, a person *would be aware of an order* to do something and that, *even during an "acute phase*, there's a *limited ability* to respond." (Emphasis added.)

19. In the face of such an inconclusive record of expert testimony offered as rebuttal and mindful as well of the Government's affirmative evidence and reasonable inferences therefrom that would support a conclusion that appellant had the necessary *mens rea*,[2] we cannot say that the evidence is

2. For instance, Sergeant Wilcox testified that appellant was disrespectful and sought to fight when Wilcox had counseled him about operational security. Thus, appellant's aggressiveness and willingness to physically assault his superiors were not limited to situations in which his phobia might drive him to seek escape from a confined area, in turn lending support to an

insufficient when measured against the strict standard of *Jackson v. Virginia* and *United States v. Turner*, both *supra*. ¶ 15. *See generally United States v. Rooks*, *supra*. ¶ 14.

## II

20. In the next granted issue, appellant urges that the military judge was the victim of unlawful command influence. Appellant reasons that this influence emanated from the military judge's "perceived demotion due to his lenient sentencing philosophy and the corresponding general perception that a senior judge had been assigned to Fort Hood because of the senior judge's harsh sentencing philosophy." Certain aspects of appellant's argument in the form of his statement of the appellate issue are overstated. In any event, our *de novo* review of this issue satisfies us that no unlawful command influence existed.

## A

21. At the point early in the trial when trial counsel, as a matter of rote, asked the military judge whether he knew of any grounds for challenge against him, the judge revealed that he had been "relieved" of the "responsibilities" of being the "senior military judge" at Fort Hood by virtue of the recent assignment to Fort Hood of a more senior judge, Colonel Green. Further, he acknowledged "the rumor and the appearance" that this turn of events might have been triggered by the military judge's perceived leniency in sentencing. He stated that, regardless, he "would like the defense to know that I will do my very best not to let it influence me in the performance of my duties as military judge in this case. . . ."

22. As might be expected, a lengthy *voir dire* of the military judge ensued. He denied feeling any pressure to increase his sentences but did admit having some "general concern" as a result of the circumstances. In some detail, the military judge indicated that no one in any fashion had ever tried to pressure him in his sentencing or even to discuss the matter with him. When he had learned of Colonel Green's planned assignment to Fort Hood, the military judge had inquired of his judicial superiors—Colonel Yawn, the Chief Circuit Judge; Colonel Gilligan, the then-new Chief Trial Judge; and General Gray, the then-new commander of the U.S. Army Legal Services Agency—and had been informed that the decision to assign Colonel Green was due to plans to make Fort Hood "a trial judicial center, thus necessitating three judges instead of two."

23. The military judge acknowledged during *voir dire* his own view that Colonel Green's assignment to Fort Hood was a demotion for himself. Still, he specially found that he had no reason to believe that he had been replaced as senior-most military judge because of his sentencing philosophy, even though he felt there was the appearance that this was the reason for Colonel Green's assignment to Fort Hood.

24. The military judge also addressed the psychological impact on his sentencing performance from all this. He indicated during *voir dire* that he would not alter his sentencing intentionally and felt no need to impose stiffer sentences as a result of these events. In the end, he found no reason to recuse himself from appellant's case, and defense counsel did not challenge him.

25. At the conclusion of *voir dire*, the defense asked for an opportunity to present evidence on the issue of command influence. With leave granted by the military judge, counsel called several witnesses. Among them were Colonel Green and Colonel Eggers, the former chief of the Army's trial judiciary, who together explained the circumstances that led to the former's reassignment to Fort Hood pursuant to his normal duty rotation from Germany. These details are fully set out in the opinion below. 37 MJ at 897–98.

26. With the evidence in, the defense acknowledged the lack of any basis to argue the actual existence of command influence;

inference that the assaults underlying the charges here were accompanied by the necessary

*mens rea.*

nonetheless, the defense expressed concern over the apparent command influence emanating from these events, *see United States v. Allen,* 33 MJ 209 (CMA 1991), *cert. denied,* 503 U.S. 936, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992). Ultimately, though, the military judge found no evidence linking the occasional expression of unhappiness with his sentencing and Colonel Green's assignment to Fort Hood and no evidence of any command influence that would deny appellant a fair trial.

27. In due course, trial proceeded before the military judge alone, per the timely request of appellant. Findings and sentence, as reported earlier, followed.

28. Subsequently, the issue of unlawful command influence again was addressed in a post-trial session called by the military judge at the request of defense counsel. *See* Art. 39(a), UCMJ, 10 USC § 839(a); RCM 1102(a), Manual for Courts–Martial, United States, 1984. Defense counsel indicated he had new evidence suggesting that, despite earlier conclusions to the contrary, disenchantment with the military judge's sentencing in fact had been communicated to his judicial superiors by the local staff judge advocate and, possibly, via a general-officer commander, as well. Counsel contended that this new evidence put a whole new light on the possibility that Colonel Green's assignment to Fort Hood was legally malevolent.

29. To present this new evidence, the defense asked to call five witnesses. Walking a line between this request and trial counsel's objection to the entire proceeding as a rehash of the earlier litigation, the military judge ruled that the defense could reopen this question but that the two lawyers should make all reasonable attempts to obtain and present the evidence without live attendance of the witnesses. Ultimately, even though the defense maintained that they were not satisfied with their opportunity to fully probe the witnesses, their testimony was presented by way of stipulations of expected testimony that were the fruit of several telephone conversations between the two attorneys and each witness.

30. Following lengthy argument by both sides and a recess by the military judge in order to study the stipulations, the military judge made the following findings:

First, I would like to indicate that I am very concerned and sensitive to the defense's assertion of command influence in this case, as the evidence which we have before us does reveal the following—and let me just summarize a little of the facts:

First, during the fall of 1989, apparently there was dissatisfaction among many of the trial counsel and SJAs concerning the sentences which were imposed by me in the cases tried at Fort Hood.

Second, these concerns were specifically relayed by Colonel Walczak and Colonel Leeling, the SJAs of the 1st Cavalry Division and 2nd Armored Division, to then-Colonel Gray, who was the SJA of III Corps, and who then later became Brigadier General Gray, chief of the Trial Judiciary, and commander of the U.S. Army Legal Services Agency.

Three, Colonel Walczak, as III Corps SJA, replacing Colonel Gray in late September of 1989, voiced his concerns about my sentencing to Colonel Yawn, who was the chief judge of this circuit. Also, Colonel Leeling expressed to Colonel Eggers, the chief trial judge, in the fall of 1989, the dissatisfaction of both Colonel Walczak and Colonel Leeling as to my sentences.

Four, Colonel Gray, in the fall of 1989, also passed on to Colonel Eggers the dissatisfaction of Colonel Walczak and Colonel Leeling. Apparently, most of these conversations took place at the annual SJA conference held in October of 1989.

Next, I would like to note that in Colonel Yawn's statement, that apparently Colonel Walczak passed on to Colonel Yawn, Lieutenant General Graves, who was the III Corps commander, his dissatisfaction as to my, quote, "light" sentences.

Thus, apparently, there was, in fact, on numerous occasions, complaints made by Colonel Walczak and Colonel Leeling of my sentencing, which did, in fact, reach Colonel Yawn, the chief judge of this circuit, General Gray, who was pending his confirmation for promotion and assignment

as Chief of Army Judiciary, and Colonel Eggers, who was, at that time, the Army's chief trial judge. And as I mentioned, these complaints also included concerns expressed by, apparently, Lieutenant General Graves.

Sixth, according to Colonel Corrigan's stipulation, the chief trial judge has significant input in the assignment of judges.

Seven, during 1990, there apparently was a discussion and the determination to add a third judge at Fort Hood, and to phase out the judges at Fort Polk and Fort Bliss, thus, in effect, creating a Trial Judicial Center at Fort Hood.

Eight, as a result of that decision, in the spring of 1991, Lieutenant Colonel Hewitt [the other military judge then assigned to Fort Hood] received a phone call from Colonel Green from Germany, informing us that he, in fact, had been assigned to Fort Hood as the senior military judge.

Nine, Colonel Green arrived in July of 1991, and, being senior to me, he, in effect, replaced me as the senior judge at Fort Hood, and there has been ample testimony to indicate that Colonel Green could well be described as a tougher sentencer than I am.

Ten, as we noted at our prior sessions, Colonel Green is in charge of all docketing and assigns cases to both me and Colonel Hewitt for trial.

From this brief synopsis of the facts, I would indeed share the concern of the defense that, appearance-wise, there was a suggestion of potential impropriety in the assigning of Colonel Green which could, as the defense pointed out, have the effect of undermining the public's confidence in the court-martial system.

* * *

However, upon careful review of all of the evidence, to include the testimony of Colonel Green, there has been no evidence which indicates that the dissatisfaction of Colonel Walczak and Colonel Leeling, which, in fact, had been made known to Colonel Yawn, Colonel Eggers, and General Gray, was, in fact, a consideration in the assignment of Colonel Green. In fact, the stipulations of both Colonel Eggers and General Gray specifically deny any such linkage.

Considering that there is no evidence supporting the position that the dissatisfaction of the SJAs as to my sentencing here at Fort Hood played any role in Colonel Green's assignment to Fort Hood, the motion by the defense to dismiss the charges and specifications is denied.

* * *

Lastly, should the appellate courts disagree with my findings as to command influence, then I would just like to add that notwithstanding any possible command influence, I, as I pointed out in our prior sessions, am more than satisfied that PFC Campos has, in fact, received a fair and unbiased trial, both as to the findings and also as to the sentence, and he was not in any way affected by it.

Thus, as I have indicated earlier, the motion by the defense to dismiss the specifications and charges, due to unlawful command influence, is denied.

B

31. Unlawful "[c]ommand influence is the mortal enemy of military justice." *United States v. Thomas*, 22 MJ 388, 393 (CMA 1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). Indeed, even "the appearance of unlawful command influence is as devastating to the military justice system as the actual manipulation of any given trial. *Cf. United States v. Cruz*, 25 MJ 326 (CMA 1987)." *United States v. Allen*, 33 MJ at 212. Accordingly, we cannot countenance—indeed, we condemn—the calculated carping to the judge's judicial superiors about his sentencing philosophy. Part of the trade-off in a system in which judges lack tenure and professionally survive only by grace, *see United States v. Graf*, 35 MJ 450 (CMA 1992), *cert. denied*, —— U.S. ——, 114 S.Ct. 917, 127 L.Ed.2d 206 (1994), is special vigilance to assure judicial independence. *See United States v. Allen, supra; United States v. Mabe*, 33 MJ 200 (CMA 1991).

32. In this case, however, because of the military judge's candid disclosure of his mindset on the record early in the proceedings and his willingness to permit fuller litigation of the issue at a post-trial session when additional evidence had become available, any question about the fact of unlawful command influence or any role that its appearance might have played in appellant's trial was openly addressed and resolved.

33. First, the military judge found as fact that any concern over his sentencing philosophy had played no role at all in Colonel Green's assignment to Fort Hood. At the end of the first Article 39(a) session, the judge factually concluded that local unrest over his sentences had not been communicated to his judicial superiors and, therefore, could not have affected Colonel Green's assignment. When evidence at the post-trial session indicated that the local dissatisfaction in fact had been communicated through various levels of the military judge's judicial chain of command, other evidence convinced the military judge nonetheless that that communication had not been a factor in Colonel Green's assignment, despite local rumor to the contrary.

34. Far from being clearly erroneous, this finding is amply supported in the record. Further, the Court of Military Review, exercising its factfinding powers, *see* Art. 66(c), UCMJ, 10 USC § 866(c), agreed with the military judge. That being the case, we are satisfied beyond a reasonable doubt that no unlawful command influence was involved in Colonel Green's assignment to Fort Hood. *See United States v. Allen*, 33 MJ at 212 (applied beyond-reasonable-doubt standard to question of unlawful command influence on military judge's performance); *see also United States v. Reynolds*, 40 MJ 198, 202 (CMA 1994)(applied same standard to question whether unlawful command influence "tainted" members' performance).

35. Second, the military judge made it clear at the end of the first Article 39(a) session that he would not be affected in appellant's trial by the local criticism of his sentencing; and he specifically found at the end of the post-trial session that "PFC Cam-

pos has, in fact, received a fair and unbiased trial, both as to the findings and also as to the sentence, and he was not in any way affected by" any of the events involved in the litigation of command influence. These assurances, which are fully consistent with the record of the litigation, satisfy us beyond a reasonable doubt that the military judge's performance was not affected in any way by this issue. Thus, there is no nexus at all between even a *claim* of unlawful command influence, on the one hand, and the outcome of appellant's trial, on the other. *Cf.* 33 MJ at 213 ("Further, by informing the parties and allowing *voir dire* on the issue, Judge Reed eliminated the possibility of creating the misperception that he might not be impartial.").

36. Finally, we are equally satisfied that even an appearance of unlawful command influence—which might have been generated by the communications to the judge's superiors of dissatisfaction with his sentences and by the judge's own initial expressions of misgivings as to whether that dissatisfaction had played some role in Colonel Green's assignment—was fully dispersed by the full and open litigation of the issue. At the conclusion of that litigation and considering the evidence adduced, no reasonable person who knew all of the facts would harbor any misgivings regarding either the fact of unlawful command influence or the role that an appearance of it might have played in this trial. *Cf.* 33 MJ at 212.

III

37. As recounted earlier, the defense sought during the post-trial proceeding to obtain the live testimony of five witnesses. Instead, the military judge admonished trial and defense counsel together to interview these witnesses over the telephone and to make all reasonable efforts to obtain their testimony by way of stipulation. In the end, the stipulations were presented, but defense counsel continued to maintain that this method was not satisfactory from his viewpoint.

38. As in *United States v. Allen*, 33 MJ at 214, it is clear that "appellant was not deprived of the ability to present his case be-

cause he was forced to use [stipulations of expected testimony] as evidence rather than ... live witness[es]." All five witnesses cooperated with counsel, and their stipulations apparently were complete explications of their knowledge. The only specific mentioned by counsel in support of his claim that the method of producing this evidence was not satisfactory is a certain inconsistency between Colonel Walczak's and Brigadier General Gray's stipulations. The former denies that he had ever talked to BG Gray about the military judge's sentencing, while the latter states that Colonel Walczak had indeed talked to him about the matter and that he had passed it on to Colonel Eggers. Either way, it is clear that, at a minimum, Colonel Walczak did talk to Colonel Yawn about it and that Colonel Yawn passed it on to Colonel Eggers.

39. As we said in *Allen:* "This is not a situation where the accused is seeking to have a face-to-face confrontation with his accuser. Rather, this is an interlocutory matter which, although important to the prosecution, was not dispositive thereof." 33 MJ at 214 (citation omitted). Considering the live attendance of Colonel Green, the open and free-ranging *voir dire* of the military judge, and the apparently comprehensive scope and generally consistent substance of the stipulations, we are satisfied that the military judge did not abuse his discretion in denying the live testimony of these witnesses in favor of their stipulations of expected testimony. *See generally United States v. Roberts,* 10 MJ 308, 313 (CMA 1981)(standard of review of judge's ruling on request for witnesses is abuse of discretion); *United States v. Tangpuz,* 5 MJ 426, 429 (CMA 1978).

IV

40. Finally, appellant alleges that the military judge erred by not recusing himself from appellant's court-martial *sua sponte.* His contention that the judge's arguable duty was a *sua sponte* one is impelled by the fact that appellant did not move for the judge's recusal and, in fact, vigorously opposed trial counsel's challenge for cause against the military judge. *See* RCM 902(e) (may waive

certain objections to military judge where possible ground for disqualification is fully disclosed on record).

41. As legal support for his contention, appellant points to RCM 902(a), which admonishes a military judge to "disqualify himself or herself in any proceeding in which that military judge's impartiality might reasonably be questioned." *Accord* Canon 3E(1), ABA Code of Judicial Conduct (1990). Appellant alleges three bases for his appellate attack on the military judge's failure to step aside. None is meritorious.

42. The first two relate to the military judge's "personal feelings about being replaced by Colonel Green" and to "his personal knowledge of the facts relating to appellant's allegation of unlawful command influence." Final Brief at 49. As to the first, the record clearly reflects an exhaustive evidentiary inquiry that solidly established that any prior "personal feelings" were unsubstantiated in fact and that Colonel Green's assignment was unrelated to any grumbling about the military judge's sentencing. In any event, any lingering "personal feelings" of the military judge would have militated in favor of appellant's interests, not in opposition to them. As to the second, the military judge's "personal knowledge" of the relevant facts actually was quite limited and, to the extent he had any such knowledge, was fully divulged on his own initiative during *voir dire.*

43. Where the military judge makes full disclosure on the record and affirmatively disclaims any impact on him, where the defense has full opportunity to *voir dire* the military judge and to present evidence on the question, and where such record demonstrates that appellant obviously was not prejudiced by the military judge's not recusing himself, the concerns of RCM 902(a) are fully met. *See United States v. Mabe, supra.*

44. In the third prong of his argument, appellant points out that the military judge "was called upon to rule on the correctness of his own prior ruling" concerning command influence. Final Brief at 49. At least in the absence of any "evidence that the

military judge forfeited his judicial mantle of impartiality that would necessitate a disqualification," *United States v. Sanchez*, 37 MJ 426, 428 (CMA 1993), a judge is not barred from judicially reviewing and ruling upon the correctness of a prior judicial ruling made by himself. *See id.* and cases discussed therein.

45. Thus, considering all bases of appellant's argument, we are satisfied that the military judge did not abuse his discretion in not recusing himself *sua sponte* from sitting on appellant's court-martial. *See generally United States v. Elzy*, 25 MJ 416, 417 (CMA 1988)(military judge's decision on recusal is subject to review for abuse of discretion).

## V

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX, CRAWFORD, and GIERKE concur.