**UNITED STATES**

v.

**Byron H. MAHLER, 546 41 4412, Lance Corporal (E–3), U.S. Marine Corps.**

**NMCM 97 00558.**

U.S. Navy–Marine Corps Court
of Criminal Appeals.

Sentence Adjudged 23 Jan. 1996.

Decided 17 Dec. 1998.

LT Syed N. Ahmad, JAGC, USNR, Appellate Defense Counsel.

Gary R. Myers, Civilian Defense Counsel.

LT Russell J.E. Verby, JAGC, USNR, Appellate Government Counsel.

CAPT James M. Warden, JAGC, USNR, Appellate Government Counsel.

Before OLIVER, Chief Judge, and DORMAN and ROLPH, Appellate Military Judges.

ROLPH, Judge:

A general court-martial composed of officer and enlisted members convicted the appellant, contrary to his pleas, of assault consummated by a battery upon Kade Mahler, his 17–day–old son by burning him on the back with a hot object, and of murdering his son by engaging in inherently dangerous acts (forcefully shaking and striking his son with his hands), in violation of Articles 128 and

118(3), Uniform Code of Military Justice, 10 U.S.C. §§ 928 and 918(3)(1998)[hereinafter UCMJ].[1] The members sentenced the appellant to life in prison, a dishonorable discharge, total forfeitures of all pay and allowances, and reduction to E–1. The convening authority approved the sentence as adjudged.

We have thoroughly and carefully reviewed the record of trial, the appellant's five assignments of error,[2] and the briefs submitted by both defense and Government appellate counsel. Except as discussed below, we conclude that the findings and sentence in this case are correct in law and fact, and that no error materially prejudicial to the substantial rights of the appellant was committed. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

### Facts

This tragic case involved two alleged acts of severe child abuse by the appellant, the latter of which ultimately resulted in the death of his newborn son, Kade Mahler. At approximately 1400 on 14 July 1995, the appellant and his wife arrived at the Acute Care Unit of the Naval Hospital at Camp Pendleton, California, with their 17–day–old infant son, stating that he was having difficulty breathing, and that he had been "burned on his back by spilled coffee." Immediately recognizing that the infant was in acute distress, the nurse on duty rushed Kade to the emergency room where resuscitative efforts were commenced. Ultimately, Kade was transferred to the Pediatric Intensive Care Unit of the Naval Medical Center

(Balboa), San Diego, CA, where he was eventually declared "brain dead" and, on 22 July 1995, removed from life-support systems. The San Diego Medical Examiner's Office conducted an autopsy on Kade and determined the cause of death to be "shaken-impacted infant syndrome." Record at 764.

Medical personnel at Naval Hospital, Camp Pendleton, California, almost immediately suspected some form of child abuse because of what appeared to be a circular thermal burn on Kade's back, consistent in size and shape with the tip of a lighted cigar. Record at 455–456. In attempting to obtain a history on Kade and determine what might have caused his condition upon admission (his burn and internal distress), a family practice resident, Dr. Laura Dyer (LT, MC, USN), interviewed appellant and his wife in the waiting room. The appellant stated to Dr. Dyer that it had been "his turn" to get up with the baby and that he did so at 0330 that morning when Kade began crying. He claimed that Kade began choking and stopped breathing while nursing on his bottle. In an effort to get his son to breathe again, the appellant stated that he hit Kade on the back and rubbed his neck. *Id.* at 474. According to appellant, Kade coughed, began to breathe again, drank the rest of his bottle, and went back to sleep. *Id.* The appellant told Dr. Dyer that if they saw bruising on Kade's neck, it was from him "rubbing the neck to try to restore breathing." *Id.* He claimed the baby slept well until the next feeding sometime around 0900 when "milk

---

1. The appellant was found not guilty of two additional specifications pled alternatively under Article 118(2), UCMJ, 10 U.S.C. § 918(2), alleging unpremeditated murder by forcefully shaking and striking Kade Mahler, and unpremeditated murder by deliberately failing to provide prompt medical attention. Also, the military judge granted the appellant's motion for a finding of not guilty of the greater offense originally alleged under Article 128, assault "with a means likely to produce death or grievous bodily harm."

2. I. APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY BOTH THE SIXTH AMENDMENT AND 10 U.S.C. § 827 WHERE CIVILIAN DEFENSE COUNSEL FAILED TO VIGOROUSLY INVESTIGATE ALLEGATIONS THAT THE DECEASED INFANT VICTIM WAS "BURNED" BY APPEL-

LANT AND FAILED TO DEFEND AGAINST SUCH ALLEGATIONS AT TRIAL.

II. UNDER MILITARY RULE OF EVIDENCE 606(b), THERE WAS UNLAWFUL COMMAND INFLUENCE IN COURT DELIBERATIONS WHEN THE SENIOR MEMBER UTILIZED HIS SUPERIOR RANK TO SWAY OTHER MEMBERS.

III. THE CONVENING AUTHORITY ERRED WHEN HE CONSIDERED MATTERS OUTSIDE OF THE RECORD BY CONTACTING THE MEMBERS OF THE COURT–MARTIAL AFTER THE TRIAL, WITHOUT PROVIDING THIS INFORMATION TO THE ACCUSED.

IV. APPELLANT'S SENTENCE TO LIFE IMPRISONMENT IS INAPPROPRIATELY SEVERE.

V. THE RECORD OF TRIAL WAS NOT PROPERLY AUTHENTICATED.

just ran out of his mouth." *Id.* Despite this behavior, neither parent made any effort to get Kade to the hospital. They claimed they thought Kade was simply "tired" from having been up crying earlier. When specifically asked about the source of the burn on Kade's back, the appellant claimed that it had been accidentally inflicted when "clumbsy old dad spilled coffee on the baby" sometime around 0430 that morning. *Id.* at 475. When one of the staff pediatricians, Dr. Peggy Shaffer (LCDR, MC, USN), later went to the waiting room to update appellant and his wife concerning their son's condition, the source of the burn came up again. The appellant reiterated his assertion that the burn was the result of spilled coffee. When Dr. Shaffer told him that the shape of the burn was inconsistent with a hot liquid burn because of its distinctly circular characteristic, the appellant spontaneously stated, "Oh, like a cigar burn," or "I've seen a cigar burn." *Id.* at 514.

In a statement provided later that evening to agents of the Naval Criminal Investigative Service (NCIS), appellant claimed that he had attempted to "vigorously" resuscitate Kade after he stopped breathing around 0330, and that he had actually performed mouth-to-mouth resuscitation. In his signed and written statement, the appellant said:

> [Kade] got upset and wasn't breathing right[;] he was having long gasps. I lost my cool. I shook him vigorously for probably 5–10 seconds while he was on the hide-away bed. I saw Kade's head bounce off the mattress for about one dozen times. He fussed a little bit and he kind of moaned. This is when he stopped breathing all together. I panicked. I started to try to revive him. I was hitting the back of his head and his cheeks with my open hand.

Prosecution Exhibit 3, at 2–3.

Appellant claims that Kade eventually started breathing again, and drank some from his bottle. *Id.* at 3. He never woke his wife, who was asleep in their room, and he never sought any type of medical assistance at this time. At approximately 1200, Kade stopped breathing again. Appellant and his wife immersed him in cold water to get him

to breathe, and appellant once again administered mouth-to-mouth resuscitation. *Id.* Finally, at approximately 1400, some 11 hours after Kade first displayed breathing problems, appellant and his wife brought their son to the emergency room at Camp Pendleton.

The Government's theory was that the appellant had intentionally burned Kade with a cigar when he wouldn't stop crying, and then, in a fit of anger, violently shook his newborn son causing brain damage and, ultimately, brain death. According to the Government, Kade's death was a homicide. The defense theory was that Kade had been accidentally burned by spilled coffee or some unknown chemical or hot object, and that his ultimate death was not murder. Instead, they argued that his death resulted naturally from a rare congenital heart defect known as "DiGeorge's Sequence." The defense attempted to explain the accused's statement to NCIS by asserting that the phrase, "I lost my cool," did not indicate anger on the part of the appellant, but rather panic over his son's inability to breathe.

### Ineffective Assistance of Counsel

In appellant's first assignment of error, he alleges that his civilian defense counsel, Mr. Edward Torrence, was ineffective because he failed to vigorously investigate, and defend against, the allegation that appellant had intentionally burned his infant son with a cigar or similar hot object. Appellant's Brief at 4. Accordingly, he asserts that he was denied his right to effective assistance of counsel, as guaranteed by the Sixth Amendment to the Constitution, and by Article 27, UCMJ, 10 U.S.C. § 827, and asks that we set aside his guilty findings. *Id.* at 4, 11.

Asserting that the thermal burn on baby Kade's back was literally "the case against him," appellant claims that his civilian defense counsel virtually ignored that charge (i.e., violation of Article 128, UCMJ) and concentrated all of his efforts exclusively on defending the murder charge. *Id.* at 6–11. In doing so, appellant alleges that he was unable to directly refute the Government's theory as to the type and source of the burn,

a critical requirement of his defense. *Id.*[3] In support of this assignment of error, the appellant has submitted numerous letters and affidavits.[4] One affidavit is from the appellant's mother, Mrs. Debra L. Mahler, who alleges that she repeatedly stressed to Mr. Torrence the importance of disproving the burn injury and charge, only to be told that the burn "was not the important issue." *Id.* at Exhibit A, pg. 1. She asserts that Mr. Torrence was not even aware that there was a separate charge on the charge sheet relating to the burn injury. *Id.* at Exhibit A, pg. 2. Although Mr. Torrence eventually consulted a burn expert, that expert's ultimate opinion was consistent with the Government's theory (i.e., that it was a thermal burn), and his opinion was not helpful to the defense. *Id.* at Exhibit C. Mrs. Mahler's affidavit claims that this "eleventh hour" attempt to find an expert left no time to locate someone who could directly refute the Government's assertion that this was a cigar burn, despite her many requests that he arrange for such. *Id.* at Exhibit A, pg. 2. The detailed defense counsel in this case submitted an affidavit stating that he and Mr. Torrence discussed the critical significance of properly explaining the burn to the members. He claims that Mr. Torrence told him he would have one of his expert witnesses testify that the wound on Kade's back was not a burn. *Id.* at Exhibit D. Detailed defense counsel went on to state:

> To my surprise, Mr. Torrence never presented any evidence to refute the government's evidence that the wound on baby Mahler's back was a burn. I believe in his closing argument Mr. Torrence even conceded the wound could in fact have been a burn. After hearing this, myself [sic] and the other civilian counsel looked at each other in total disbelief.

*Id.*

Finally, as additional support for this assignment of error, appellant has submitted an affidavit from Dr. Leo Indianer, M.D., a dermatologist who, almost 2 years after this trial, examined a slide ostensibly containing skin tissue from Kade's burn and opined that the tissue did not evidence a burn "of any type," but instead showed "pressure necrosis (equivalent to a bed sore) aggravated by the coma state." *Id.* at Exhibit F, pg. 2.

■ As a general rule, trial defense counsel enjoys a strong presumption in law that he was competent, rendered adequate assistance at trial, and made all significant decisions in the exercise of reasonable professional judgment. *United States v. Scott,* 24 M.J. 186, 188 (C.M.A.1987); *United States v. Clark,* 45 M.J. 613, 615 (Army Ct.Crim. App.1997). Thus, appellant bears a very heavy burden in overcoming the presumption of effectiveness and demonstrating: (1) that his counsel's performance was so deficient that he was not functioning as "counsel" within the meaning of the Sixth Amendment, and (2) that his counsel's deficient performance prejudiced the defense, that is, counsel's performance rendered the results of the trial unreliable or the trial itself fundamentally unfair. *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). *See United States v. Ingham,* 42 M.J. 218, 223 (1995).

■ The analysis of an ineffective assistance of counsel claim may not be premised solely upon an outcome determination, but must instead examine whether the result of the proceeding was fundamentally unfair or was unreliable. *United States v. Murphy,* 36 M.J. 1137, 1146 (A.C.M.R.1993).

> The test of counsel's performance is not that he lost; and, it is not that some number of options were not pursued or could have been pursued differently. The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

---

**3.** Appellate defense counsel stated their view of how critical it was to properly defend against the burn this way: "If this was a cigar burn or any intentionally inflicted burn, Appellant was a baby kill[er]. Period. End." Appellant's Brief at 11.

**4.** Attached to Appellant's Brief as Exhibits A–G.

*Clark,* 45 M.J. at 616 (citing *Strickland,* 466 U.S. at 686, 104 S.Ct. 2052).

Further, counsel's performance is judged upon the reasonableness of the counsel's perspective at the time of the alleged deficiency. *United States v. Brothers,* 30 M.J. 289, 291 (C.M.A.1990); *Scott,* 24 M.J. at 188. Whether an appellant was prejudiced by ineffective assistance of counsel is a mixed question of law and fact, reviewable *de novo* on appeal. *Strickland,* 466 U.S. at 698, 104 S.Ct. 2052.

The civilian trial defense counsel, Mr. Torrence, has not submitted an affidavit for this court's consideration, responding to the allegations of ineffectiveness. In this case, that fact does not trouble us. Our superior court has held that, in light of the strong presumption of competence enjoyed by trial defense counsel, they "should not be compelled to justify their actions until a court of competent jurisdiction reviews the allegations of ineffectiveness and the government response, examines the record, and determines that the allegations and the record contain evidence which, if unrebutted, would overcome the presumption of competence." *United States v. Lewis,* 42 M.J. 1, 6 (1995); *see United States v. McGillis,* 27 M.J. 462, 463 (C.M.A.1988)(summary disposition)(some claims of ineffectiveness can be resolved from consideration of the record). If we can determine that the presumption of ineffectiveness has not been overcome by appellant's showing, this issue may be resolved without intruding into the attorney-client relationship by requiring a rebuttal affidavit from Mr. Torrence. *Clark,* 45 M.J. at 616. We hold that the appellant has failed to meet his threshold burden of producing evidence sufficient to overcome the strong presumption that his civilian defense counsel rendered professionally competent assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland,* 466 U.S. at 689–700, 104 S.Ct. 2052.

Our review of the record and all matters submitted by the appellant for our consideration has unequivocally confirmed that Mr. Torrence's performance was effective throughout this long, difficult, and challenging murder trial. In what one might describe as a classic "battle of the experts," Mr. Torrence displayed a complete and thorough understanding of the many complex medical and legal issues that arose throughout this case. We have specifically reviewed his actions and performance in regard to the "burn issue" at trial, and find that his representation of the appellant in regard to this matter was more than competent. Appellant's assertion that Mr. Torrence essentially "ignored" the burn injury on Kade Mahler's back is simply unsupported in the record.

First, we note a significant inconsistency in the affidavits submitted by the appellant in support of his assertion of ineffectiveness. The appellant's mother maintains that Mr. Torrence stated to her that the burn injury "was not the important issue," and did nothing to prepare to defend against it. Appellant's Brief at Exhibit A. However, detailed defense counsel, Major Barthel, states in his affidavit that he and Mr. Torrence had numerous conversations and meetings throughout the pretrial preparation of this case during which they specifically discussed trial strategy in regard to the burn injury. *Id.* at Exhibit D. According to Major Barthel, Mr. Torrence agreed that the burn injury was significant, and he planned to obtain the services of a defense expert to discuss the burn. *Id.* In fact, on 11 October 1995, Mr. Torrence forwarded copies of the autopsy and histology reports in this case (along with color photos of the "skin lesion in question" and a microscopic slide containing two sections of skin acquired from Kade's autopsy) to Dr. John Hansborough, M.D., Professor of Surgery and Director of the Regional Burn Center at the University of California at San Diego. In his letter, which was a follow-up to an earlier telephone conversation he had with Dr. Hansborough, he posed the basic questions he wanted addressed:

1. Is this a thermal burn?

2. Is it caused by a cigarette or cigar?

3. Is it possible to tell if it is a cigarette or cigar?

4. Is it consistent with other sources, i.e., a metal button or coin heated from sun exposure in a closed car? Date of incident was Mid–July, 1995.

5. Are there any other relevant conclusions which may be drawn from the size, shape or location of the lesion?

*Id.* at Exhibit B, pg. 1–2.

In his response written on the same day as Mr. Torrence's request, Dr. Hansborough concluded that Kade's "skin lesion" was consistent with a thermal burn that could have been caused by the lighted tip of a cigar (the Government's theory of etiology), proving unhelpful to the defense. *Id.* at Exhibit C, pg. 2. His opinion also disproved the possibility that the injury could have come from a metal button or coin heated from sun exposure. *Id.*

We do not agree with appellant's claim that this was an "eleventh hour" attempt by Mr. Torrence to address the burn injury. In fact, although preliminary Article 39(a), UCMJ, 10 U.S.C. § 839(a), sessions in this case began on 16 October 1995, trial on the merits was not scheduled to commence until January 1996, almost 3 months later. Although apparently unsuccessful at obtaining an independent defense expert who would support a defense theory as to the source or identity of the "skin lesion," our review of the record indicates that Mr. Torrence did not "quit" defending against the Government's theory that it was a cigar burn. In his opening statement, Mr. Torrence addressed the burn directly, and effectively developed the theme that the prosecution had rushed to judgment in describing (and charging) this "lesion" as an intentional burn, and that the Government's own experts would be unable to rule out multiple other possible causes. Record at 447. He thereafter effectively cross-examined every Government expert who testified concerning the burn, winning their concurrence that, although the "lesion" appeared to be a thermal burn, they could not conclusively state that the burn had been intentionally inflicted, could not specifically age the burn, and could not positively rule out multiple other possible causes (e.g., chemicals in common household cleaners, rare infections, or hot liquid spills).[5] Finally, in his closing argument, Mr. Torrence followed through on the theory he developed in his opening statement and during his cross-examinations. Record at 1421–23. He argued that the Government had failed to explore numerous other possibilities for how the "lesion" may have occurred, and carefully pointed out that, despite a thorough search of the appellant's apartment by NCIS agents, no "hot object" was ever discovered (in an ash tray or elsewhere) that would corroborate the Government's theory.[6] Record at 1423.

▮ In conducting our review, we will not second-guess the tactical decisions made at trial by Mr. Torrence. *United States v. Morgan*, 37 M.J. 407, 410 (C.M.A.1993)(quoting *United States v. Rivas*, 3 M.J. 282, 289 (C.M.A.1977)). While there may be other counsel who would have approached the burn injury differently, we must give deference to counsel's tactical judgment and not substitute our view with the benefit of hindsight. *United States v. Bono*, 26 M.J. 240, 242 (C.M.A. 1988); *Clark*, 45 M.J. at 616. Additionally, the fact that an expert was located some 2 years after this trial was conducted who ostensibly would have testified that "this [was]

5. Dr. Laura Dyer, LT, MC, USN, a family practice resident at Naval Hospital, Camp Pendleton, testified on cross-examination that she could not rule out the possibility that certain fungal infections such as tinnea corporis and bullous impetigo could be diagnosed as burns. Record at 490–92. The medical examiner in this case, Dr. John Eisele, admitted to Mr. Torrence that he could not rule out Kade's burn having resulted from exposure to some unknown chemical (such as those contained in many harsh household cleaners). Record at 799, 825. The Government's burn expert, Dr. Michael J. Allshouse, CDR, MC, USN, agreed on cross-examination that Kade's burn could have been caused by a very hot liquid (e.g., mercury). Record at 867. While testifying on direct that the burn was probably intentionally inflicted by a hot object, on cross-examination Dr. Allshouse agreed that he could not *conclusively* identify either the cause of the burn or its age. Record at 870.

6. Indeed, at the conclusion of the Government's case on the merits, the military judge heard and granted a defense motion for a finding of "not guilty" in regard to the alleged offense of aggravated assault "with a means or force likely to produce death or grievous bodily harm." Record at 1076–77. The appellant was ultimately convicted of the lesser offense of assault consummated by a battery.

not a burn of any type"[7] does not change our decision. We are satisfied from our review that Mr. Torrence had a clear and plausible trial strategy in connection with defending the burn injury and the Article 128, UCMJ, 10 U.S.C. § 928, charge. When considered in combination with his *overall* trial strategy and tactics aimed at vociferously defending against the allegation that the appellant had intentionally murdered his infant son by violently shaking him, there can be little doubt in any reviewer's mind that Mr. Torrence was a more than capable trial advocate on behalf of his client.

Consequently, appellant has failed to meet his heavy burden of establishing that Mr. Torrence's performance was tarnished by serious incompetency that rendered the results of his trial unreliable or unfair. We find this assignment of error to be without merit.

## Unlawful Command Influence During Deliberations

The appellant next contends that the deliberation process during his general court-martial was improperly influenced by the senior member and President of the court-martial, Colonel [W]. Appellant's Brief at 11. Specifically, he claims that Colonel [W] "engaged in unlawful command influence by using his superior rank or grade to sway other members," and asks this court to order a *Dubay*[8] hearing in order to "flesh out what happened here." *Id.* at 11–12. In support of this allegation, he has offered for our consideration an affidavit provided by his assistant civilian defense counsel, Mr. Paul H. Neuharth. Appellant's Brief at Exhibit G. In his brief affidavit, Mr. Neuharth asserts that sometime during the week following the conclusion of appellant's trial, he was contacted by Ms. Janna Butler, an employee at the Public Defender's Office. Ms. Butler allegedly claimed that she was the sister of one of the court members who sat on appellant's jury, Major [H]. *Id.*, Exhibit 6 at pg. 1. Mr. Neuharth claims that Ms. Butler told him that her brother (Major [H]) had told her that there had been "division among the members as to the verdict," and that the senior member, Colonel [W], had "pressured the other members to change their verdict from not guilty to guilty." *Id.* Ms. Butler is also alleged to have stated that Major [H] was "very uncomfortable with this but he didn't want to cause any difficulty because he ... was a career Marine and was concerned about what Colonel [W] could do to him." *Id.*, Exhibit 6 at pg. 2. Mr. Neuharth's affidavit is the sole evidence offered by the appellant in support of this assignment of error. Candidly, appellate defense counsel reveal in their brief that "Major [H] has spoken with military defense counsel and disagrees with the facts as presented by Mr. Neuharth ... and [appellate defense counsel] expects to receive a statement from Major [H] to that effect." *Id.* at 13. Despite this obvious setback to his assignment of error, appellant argues that we should nevertheless order a fact-finding hearing to resolve "the expected conflict in the statements." *Id.*

Courts-martial members are presumed to follow the instructions of the military judge during their closed session deliberations on both findings and sentencing. *United States v. Loving,* 41 M.J. 213, 235 (1994)(quoting *United States v. Holt,* 33 M.J. 400, 408 (C.M.A.1991)). "This presumption may be rebutted by competent evidence to the contrary." *Loving,* 41 M.J. at 235. In this case, as is standard in all trials before members, the military judge specifically instructed the members that: "[T]he influence of superiority in rank or grade will not be employed in any manner in an attempt to control the independence of the members of the court in the exercise of their own personal judgment." Record at 1455, 1628–29.

The precise question posed here for our determination is whether the appellant has produced sufficient evidence to raise unlawful command influence and rebut the presumption that the members, including Colonel [W], properly followed and applied the military judge's instructions. *United States v. Ayala,* 43 M.J. 296, 299 (1995); *United States v. Stombaugh,* 40 M.J. 208, 213 (C.M.A.1994); *United States v. Levite,* 25

---

7. See Appellant's Brief at Exhibit F.

8. *U.S. v. DuBay,* 17 C.M.A. 147, 37 C.M.R. 411, 1967 WL 4276 (1967).

M.J. 334, 341 (C.M.A.1987)(Cox, J. concurring). While recognizing that the threshold is generally low for triggering an inquiry into allegations of improper influence, we find that appellant has not even come close to meeting his minimum burden of producing sufficient evidence to raise unlawful command influence. *Ayala,* 43 M.J. at 299–300.

■■■■■ The quantum of evidence necessary to raise unlawful command influence is the same as that required to submit a factual issue to the trier of fact. *Id.* at 300. Mr. Neuharth's affidavit contains allegations that constitute hearsay many times removed, making it inherently untrustworthy and unreliable. No other member has submitted an affidavit that would lend any credence to this allegation. Add to that the fact that the alleged source of this "damning evidence," Major [H], has specifically disagreed with Mr. Neuharth's version of the facts.[9] "[G]eneralized, unsupported claims of [command influence] will not suffice to create a justiciable issue." *Green v. Widdecke,* 19 C.M.A. 576, 579, 42 C.M.R. 178, 181, 1970 WL 7035 (1970); *Ayala,* 43 M.J. at 299. *See United States v. Allen,* 33 M.J. 209, 212 (C.M.A. 1991)("Proof of [command influence] in the air, so to speak, will not do."). Appellant has not met his burden of producing sufficient evidence of unlawful command evidence so as to shift the burden to the Government to disprove that such occurred. Accordingly, we find that this allegation of error is also without merit.

### Convening Authority Improperly Contacted Members

In his next assignment of error, the appellant asserts that "the convening authority erred when he considered matters outside of the record by contacting the members of the court-martial after the trial, without providing this information to the accused." Appellant's Brief at 14. This assignment of error is based on a telephone conversation between Appellate Defense Counsel and Major [H], where the previously asserted issue of al-

leged unlawful command influence was being discussed. In this conversation, Appellate Defense Counsel claims that Major [H] told him that the convening authority in this case had personally contacted him after the trial, but before taking his action, to "discuss the case with him." *Id.* Major [H] could not recall any of the details of the conversation, only that the convening authority was "seeking information about the court-martial." *Id.* Allegedly, the convening authority told Major [H] that he was planning to call, or had already called, all of the court-martial members. *Id.* Appellate Defense Counsel now claims that appellant's rights under RULE FOR COURTS-MARTIAL 1107(b)(3)(B), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.)[hereinafter R.C.M.], were violated by this innocuous conversation in that the convening authority failed to refer the matter gleaned therefrom to appellant for his review and an opportunity to rebut. Appellant's brief at 15.

■■■■■ R.C.M. 1107(b)(3)(B)(iii) requires that, before taking his action on a court-martial sentence, the convening authority may consider such matters as he deems appropriate. If the convening authority considers matters *adverse* to the accused from outside the record (with knowledge of which the accused is not chargeable) the accused must be notified and given an opportunity to rebut. *Id.; see United States v. Chatman,* 46 M.J. 321, 323 (1997). The obvious deficiency in this assignment of error is in the appellant's presumption that "adverse matter" was brought to the attention of, and considered by, the convening authority as a result of this conversation with Major [H]. Again, we have before us an assignment of error based upon unsubstantiated hearsay alone. Appellant has failed to produce any credible evidence to prove that this conversation occurred, what the subject matter of the conversation was, or that other court members were similarly contacted.

We note also that there is no allegation or evidence that any matter ostensibly dis-

---

9. To date, appellant has not moved to attach to his brief a copy of any letter or statement Major [H] may have submitted in regard to this matter. We will not speculate as to the reason(s) for that, nor will we speculate as to the nature of Major [H]'s disagreement with Mr. Neuharth over his affidavit.

cussed was "adverse" within the meaning of R.C.M. 1107(b)(3)(B)(iii). No affidavit has been produced from Major [H] or from any other court-member to substantiate appellant's claim. We further note that Appellate Defense Counsel failed to provide a personal sworn affidavit in support of this allegation. Finally, there is no evidence indicating when this call was made, if it was made, in relation to the overall post-trial process.[10] The appellant bears the burden of producing at least *some evidence* to substantiate each of his individual assignments of error. This court will not accept unsubstantiated allegations contained in an appellate brief as "proof" of the matter asserted. This assignment of error is completely without merit.

### Authentication of Record of Trial

■ The appellant next claims that his record of trial was not properly authenticated. Appellant's Brief at 14. Specifically, he objects to the fact that substitute authentication procedures under R.C.M. 1104 were utilized by the Government, allowing the trial counsel to authenticate the record of trial. *Id.* Two military judges presided over this general court-martial at different stages. Judge Hollerich presided over the initial arraignment of the accused and a number of the preliminary Article 39(a), UCMJ, 10 U.S.C. § 839(a), sessions. He properly authenticated his portion of the record of trial. Record at 244.[11] Judge Hess completed the trial, and it is the absence of his participation in the authentication process that is being challenged by the appellant. The trial counsel, Captain Glazier, authenticated the record of trial on 10 July 1996, in the absence of Judge Hess. Resort to this procedure is explained in a notation contained on the authentication page of the record that reads, "Military Judge unavailable to authenticate record of trial due to Temporary Additional Duties for six weeks." Record at 1639; *see* R.C.M. 1103(b)(3)(E) (person who authenticates record of trial instead of the military

judge should attach to the record an explanation for the substitute authentication). Appellant asserts that substitute authentication in a case of this nature is only authorized "in emergencies," and that the military judge's "brief, temporary absence" from the situs of the preparation of the record of trial did not justify substitute authentication in a serious murder case involving a sentence that includes life in prison. Appellant's Brief at 19–20.

Article 54(a), UCMJ, 10 U.S.C. § 854(a), and R.C.M. 1104(a)(2)(B) specifically allow for substitute authentication by the trial counsel "if the military judge cannot authenticate the record of trial because of the military judge's death, disability, or *absence* . . . . " (emphasis added). In the discussion immediately following this rule, the following comments are made:

> Substitute authentication is authorized only in emergencies. A brief, temporary absence of the military judge from the situs of the preparation of the record of trial does not justify a substitute authentication. Prolonged absence, including permanent change of station, ordinarily justifies substitute authentication.

R.C.M. 1104 (Discussion).

Article 54(a) and R.C.M. 1104(a)(2)(B) create a preferred order of authentication which seeks to guarantee the "absolute verity" of the record of trial. *United States v. Credit*, 4 M.J. 118 (C.M.A.1977). The preference for authentication by the military judge is based upon the perception that he or she is truly neutral and unbiased. *United States v. Galaviz*, 46 M.J. 548, 550 (N.M.Ct.Crim.App. 1997). Appellant asserts that Judge Hess' 6-week period of temporary additional duty (TAD) was not an absence sufficient to justify invocation of substitute authentication procedures, allowing the trial counsel to authenticate this record. Significantly, appellant

---

10. In particular, we have no indication as to whether it was before or after the addendum to the Staff Judge Advocate's Recommendation was prepared (13 November 1996), which clearly indicates that no new matters were being raised which would necessitate further service upon the defense counsel. Addendum to Staff Judge Advocate Recommendation at 1.

11. R.C.M. 1104(a)(2)(A) requires that where two or more military judges preside over a court-martial, each judge shall authenticate the portion over which he or she presided. *See United States v. Robinson*, 24 M.J. 649, 654 (N.M.C.M.R.1987).

has not challenged the accuracy or completeness of his record, has not challenged its verbatim nature, and has not alleged any prejudice as a result of the substitute authentication. Additionally, we note that the trial counsel made no changes to the record of trial. We hold that Judge Hess' 6–week period of TAD was a significant and substantial absence triggering the substitute authentication procedures set forth in R.C.M. 1104(a). *See United States v. Walker,* 20 M.J. 971 (N.M.C.M.R.1985)(military judge's 30–day period of authorized leave was a "patently prolonged absence which triggers substitute authentication procedures."). The rationale underlying this decision is our desire not to unnecessarily delay the post-trial processing of courts-martial cases to the appellant's prejudice.

It would have been helpful to us in rendering this decision to have been presented with the specific dates of Judge Hess' TAD, as well as the location where it was performed. This would have allowed us to determine how many days of his TAD remained on the date this record was authenticated by the trial counsel, as well as how difficult it may have been for the Government to transport the record to him at his TAD assignment. Absent evidence or information to the contrary, however, we accept the declaration contained on the authentication page of the record that Judge Hess was not present to authenticate the record of trial when it was completed due to his TAD period. Record at 1639. We also accept the declaration that he would not be reasonably available to personally authenticate the record for 6 weeks. *Id.* Under these facts, we are satisfied that substitute authentication was a proper and prudent course to take to ensure that both the appellant and the Government received a timely post-trial review of this serious general court-martial. This assignment of error is without merit.

**Sentence Appropriateness**

The appellant was awarded the maximum sentence that his general court-martial could adjudge: life in prison; total forfeiture of all pay and allowances; reduction to E–1; and a dishonorable discharge. The appellant now contends that his sentence to life in prison for these offenses is inappropriately severe. In support of this assertion, appellate defense counsel directs our attention to the fact that the appellant was just 20 years old when he committed these offenses, and that he had only been a father for 3 weeks when these crimes occurred. Appellant's Brief at 16. Appellant also directs our attention to the very nature of his murder offense under Article 118(3), UCMJ, 10 U.S.C. § 918(3), and specifically the fact that this offense does not involve a specific intent to kill. He asserts that shaken infant death syndrome, by its very nature, "occurs out of frustration, where a person snaps and looses control," not from specific formulation of an intent to kill. *Id.* Appellant also relies on the written post-trial clemency recommendation of the military judge, in which Judge Hess specifically recommended that the convening authority suspend all of the appellant's confinement in excess of 25 years.[12] Finally, appellate defense counsel, in their brief, survey what they believe to be all military convictions under Article 118(3), and assert that they can find no case in which a sentence to life was imposed.[13] *Id.* at 17–18. We agree that the appellant's sentence is inappropriately severe.

 "Generally, sentence appropriateness should be judged by individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender." *United States v. Snelling,* 14 M.J. 267, 268 (C.M.A.1982)(quoting *United States v. Mamaluy,* 10 C.M.A. 102, 106–107, 27 C.M.R. 176,

---

**12.** In his letter dated 22 September 1996, Judge Hess wrote, "While I have no reason to question the correctness of the verdict or the adequacy of the counsel, the choices made by the defense on the merits of the case put Lance Corporal Mahler in an unattractive position during sentencing. In view of his youth, inexperience, and rehabilitation potential, I recommend that you suspend all confinement in excess of 25 years when you take

your action in this case." Clemency Petition at Enclosure 38.

**13.** The most severe sentence found was in *United States v. Combs,* 39 M.J. 288 (C.M.A.1994), where the accused was awarded 50 years of confinement for shaking his 18–month–old son to death and committing battery against his daughter.

180–81, 1959 WL 3587 (1959))(internal quotes omitted). While we are fully cognizant of the extremely serious nature of the offenses committed by the appellant, we believe that a sentence to life in prison for this appellant is inappropriate in light of the significant and compelling evidence in the record indicating his excellent rehabilitative potential. We will grant relief below.

## Conclusion

Accordingly, we affirm the findings. We affirm only so much of the sentence, as approved on review below, as provided for a dishonorable discharge, confinement for a period of 35 years, total forfeitures of all pay and allowances, and reduction to E–1.

Chief Judge OLIVER and Judge DORMAN concur.