**UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**Airman JESSE Q. HUTCHINSON**
**United States Air Force**

**ACM 38503**

**29 June 2015**

Sentence adjudged 21 June 2013 by GCM convened at Joint Base San Antonio–Lackland, Texas and Sheppard Air Force Base, Texas. Military Judge: Matthew D. Van Dalen and William C. Muldoon (sitting alone).

Approved Sentence: Confinement for 19 months and reduction to E-1.

Appellate Counsel for the Appellant: Major Nicholas D. Carter and Captain Jeffrey A. Davis.

Appellate Counsel for the United States: Gerald R. Bruce, Esquire.

Before

MITCHELL[1], HECKER, and BENNETT
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

HECKER, Senior Judge:

A military judge sitting as a general court-martial convicted the appellant,

---

[1] In a memorandum dated 2 February 2015, Lieutenant General Christopher F. Burne, The Judge Advocate General, designated Senior Judge Martin T. Mitchell as the Chief Appellate Military Judge in cases where Chief Judge Mark L. Allred served as the military judge or recused himself under the governing standards of judicial conduct. In this case, Chief Judge Allred had been the Chief Trial Judge of the Air Force at the time and was an affiant in this case. Therefore, he recused himself as Chief Appellate Judge, and Chief Judge Mitchell assigned the panel in this case.

consistent with his pleas, of conspiracy, wrongful sale of military property, larceny and disorderly conduct, in violation of Article 81, 108, 121, and 134, UCMJ, 10 U.S.C. §§ 881, 908, 921, 934. The military judge sentenced the appellant to confinement for 38 months and reduction to E-1. Pursuant to a pretrial agreement, the convening authority lowered the confinement to 19 months and approved the remainder of the sentence as adjudged.

On appeal, the appellant contends that the charges and specifications should be dismissed based on the appearance of unlawful command influence. The appellant contends that certain actions by the staff judge advocate, the chief trial judge of the Air Force, and a chief regional judge created the appearance of unlawful command influence relative to their effect on the mindset and actions of the original military judge in this case. Finding no error that materially prejudices the appellant's substantial rights, we affirm the findings and sentence.

*Procedural Case History*

Between May and October 2012, the appellant and a fellow security forces Airman broke into a storage facility behind the security forces building on base on three occasions and stole military property contained within it, including sniper night scopes, night vision devices, binoculars, and rangefinders, valued at over $50,000. For this conduct, the appellant was charged with larceny and conspiring with the other Airman to commit the larceny and sale of military property.[2]

On two occasions, the appellant sold some of the equipment to a local civilian. He also sold some of the equipment to a local merchant who also happened to be a confidential informant for Air Force investigators. The merchant arranged a meeting between the appellant and another individual who was allegedly interested in purchasing additional equipment. In fact, this person was an undercover officer with the local sheriff's department. On two occasions, the appellant sold or gave stolen equipment to the officer. For this course of conduct, the appellant was charged with wrongfully selling military property and wrongfully disposing of military property.[3]

These charges were preferred on 20 December 2012 and were referred to a general court-martial on 15 February 2013.[4] Soon thereafter, the trial date was scheduled for 6 May 2013, and a military judge was detailed to the court by the chief trial judge of the Air Force. The appellant was restricted to base on 1 November 2012 and placed in

---

[2] The charges included a separate specification for each category of item stolen.
[3] The charges included a separate specification for each category of item sold or disposed of.
[4] On 26 March 2013, the appellant was found unconscious in a dormitory dayroom. After fellow Airmen tried to awaken him, the appellant became violent, ultimately throwing furniture and wrestling with security forces personnel who arrived on scene. An additional charge of drunk and disorderly conduct was preferred on 16 May 2013 and referred on 6 June 2013.

pretrial confinement on 15 April 2013.

On 6 May 2013, at what was scheduled as the first day of the court-martial, the military judge granted a defense motion to compel the appointment of a new expert consultant.[5]  During that session and an Article 39(a) session on 7 May 2013, the military judge denied the defense's speedy trial motion, finding the appellant's restriction to base did not constitute restriction in lieu of arrest and therefore the Rule for Courts-Martial (R.C.M.) 707 clock did not begin to run until preferral of charges.  He also found the appellant's rights under Article 10, UCMJ, and the Fifth and Sixth Amendments[6] had not been violated by the government's actions on the case to date.  At the close of the Article 39(a) session on 7 May 2013, the military judge noted the government had appointed a new defense consultant in response to his 6 May 2013 ruling but that there was uncertainty about that expert's availability.

At an Article 39(a) session convened on 8 May 2013, the defense asked the military judge to compel a different defense consultant, contending the newly appointed consultant expressed hostility towards defense counsel and indicated she could not perform the work requested by the defense in the time frame the defense requested.  After hearing from that expert, the military judge denied the defense motion, finding she could capably assist the defense if given sufficient time to do so.  Prior to the military judge issuing his ruling, trial counsel stated the government was "okay" with the fact that this expert's availability could "significantly delay" the case.  The military judge directed the parties to confer with their experts and witnesses and provide him the following day with a proposed date to reconvene the court-martial.

The next Article 39(a) session was held on 10 May 2013 and was convened after the military judge granted the government's motion requesting the session.  The events that preceded the military judge's decision to grant that Article 39(a) session form the basis of the unlawful command influence issue in the case.  These events were not discussed in this Article 39(a) session as the military judge did not notify the parties about them until he issued a continuance order on 15 May 2013.  Details about the events that occurred between 8 and 10 May 2013 were elicited through witness testimony and documentary evidence presented before a new military judge in June 2013, as summarized below.

---

[5] On 2 May 2013, the military judge had granted a defense motion to compel a confidential expert consultant in forensic psychology, and the government, in response, had appointed an expert whose qualifications the military judge found insufficient on 6 May 2013.  The military judge also granted a defense request for a second sanity board after the first sanity board failed to review a significant amount of the appellant's mental health records from an inpatient facility where he sought treatment for a variety of psychological issues following a deployment to Afghanistan.  He also granted a defense motion to suppress the appellant's statements based on a violation of his rights under Article 31(b), UCMJ.

[6] U.S. CONST. amend. V, IV.

*Facts pertaining to Unlawful Command Influence*

As directed by the original military judge at the close of the 7 May 2013 Article 39(a), UCMJ, session, the parties provided him the next day with their availability for the resumption of the court-martial. Noting the government's Article 10, UCMJ, concerns, trial counsel indicated the government was prepared to go to trial on 13 May 2013. The defense advised that both defense counsel and their expert consultant could not be available for trial until October 2013 because the defense expert was not available until 10 June 2013 and one of the defense counsel was unable to travel between early June and the due date of her baby in late July (at which time she would enter maternity leave until early October).

Based on the information provided by the parties on 8 May 2015 and the potential for a lengthy delay, the original military judge directed a telephonic R.C.M. 802 conference in the afternoon on 9 May 2013 in order to discuss the schedule. During this conference, the government raised concerns about the potential delay and its implications on speedy trial issues. In response, defense counsel indicated the appellant had been properly advised of the implications of continuing with his defense counsel. The government asked for an Article 39(a), UCMJ, session to address the reasons for the defense delay, the appellant's understanding of the potential impact of the delay on his right to a speedy trial, and to explore whether the defense expert could shift her schedule. The military judge verbally denied that request but instructed defense counsel to again consult with their client to ensure he understood a decision to keep his current counsel would likely delay his court-martial until October 2013.

An hour after this R.C.M. 802 conference, trial counsel e-mailed the military judge to again request an Article 39(a), UCMJ, session. This time, the stated purpose of the session was to "receive [the appellant's] affirmative acknowledgement and waiver of the reasons for the delay" based on the government's continued concern over the speedy trial issue. Trial counsel also asked the military judge to inquire into the defense expert's schedule. Twenty minutes later, trial counsel again e-mailed the military judge, asking that the appellant be given the opportunity to consult with an "independent defense counsel" regarding the delay and its implications. Soon thereafter, the military judge denied the government's request for an Article 39(a), UCMJ, session, finding the detailed defense counsel were independent by virtue of their positions and that he believed defense counsel would, as officers of the court, be candid and honest regarding the advisement of their client and the availability of their expert.

Late that evening, in accordance with the military judge's instructions at the R.C.M. 802 conference, defense counsel indicated via e-mail that they met with the appellant in confinement and again discussed the continuance issues with him. After receiving that information, the appellant indicated he wanted to retain both of his defense counsel, and he "underst[ood] that he may remain in pretrial confinement as an indirect

consequence of that decision to retain [his counsel] but he [did] not consent to remaining in pretrial confinement." The e-mail also said the appellant did not waive any speedy trial rights related to this continuance and asked that the delay between 10 May and the first date of the defense expert's availability be attributed to the government, given trial counsel's previously-stated concurrence in that delay. To address the government's Article 10, UCMJ, concerns, defense counsel indicated the defense could go to trial the week of 17 or 21 June if the trial could be moved to the base where the pregnant defense counsel was assigned. When the original military judge testified regarding this situation, he indicated he accepted the defense proffer as accurate and complete, considered defense counsel to be honest and sincere, and was prepared to make a continuance ruling in reliance on it. In light of trial defense counsel's representations, the military judge did not consider it necessary to engage in a direct colloquy with the accused on this matter. He believed doing so would improperly put the appellant "on the spot," especially when the discussions could include case strategy, for example. He was also aware that some accused find the process of questioning by a military judge to be inherently coercive, and he therefore wanted to avoid engaging in such a discussion when it was not necessary. The military judge also did not believe the appellant needed to confer with another defense counsel on this matter as he saw no basis in law or fact to require this.

Early the following day, 10 May 2013, trial counsel responded to defense counsel's e-mail by again e-mailing the military judge to ask for an Article 39(a), UCMJ, session, stating it was necessary in order to capture the various e-mail communications between counsel and the content of the R.C.M. 802 sessions and was in furtherance of the government's speedy trial obligations as discussed in *United States v. Cooper*, 58 M.J. 54 (C.A.A.F. 2002).[7] Trial counsel also noted "it appears [from the defense's e-mail that] the defense is seeking an order, perhaps, for the release of the accused from pre-trial confinement." The military judge again denied the government's request for an Article 39(a), UCMJ, session to discuss these issues. He noted only the continuance issue was pending before him, and he therefore would not be addressing any pretrial confinement or speedy trial issues at that time. The military judge further informed the parties he would be issuing a continuance ruling once he received both parties' positions on the schedule. It was his intention to include information about the e-mail correspondence and R.C.M. 802 sessions within that ruling.

Later in the day on 10 May 2013, the chief regional military judge (CRMJ) for the central region (who was also the military judge's supervisor and rater) called the military judge. According to the testimony of the military judge, his supervisor informed him that

---

[7] *United States v. Cooper* held that the government's duty under Article 10, UCMJ, 10 U.S.C. § 810, to immediately try an accused who is placed in pretrial confinement does not terminate simply because the accused is arraigned. 58 M.J. 54, 60 (C.A.A.F. 2003). Although arraignment changes the speedy trial landscape because the military judge's power to process the case increases while the power of the government to affect the case decreases, Article 10, UCMJ, still imposes an affirmative obligation on the government to proceed to trial with reasonable diligence. *Id.*

he had received a call from the staff judge advocate (SJA) to the special court-martial convening authority for this case. The CRMJ indicated the SJA said the military judge was being recalcitrant, and the CRMJ asked the military judge for information on the situation. Having just received two electronic requests for an Article 39(a), UCMJ, session from trial counsel, the military judge understood exactly what his supervisor was referring to, and he then explained the chronology of the case to the CRMJ. He felt the need to do this because his judicial temperament had been questioned to his supervisor. The military judge did not recall the CRMJ telling him that the SJA did not want to pressure him. The CRMJ also did not relay any messages from the SJA, nor did he direct or suggest any course of action to the military judge. The military judge did not feel the CRMJ was trying to influence him and believed the CRMJ's call was made "with the best of intentions." He informed the CRMJ that he was not going to convene an Article 39(a), UCMJ, session.

As he considered the matter after the call, however, the military judge became annoyed and unhappy. His impression was that the SJA was unhappy with his decision to not hold an Article 39(a), UCMJ, session and considered it important enough to call the military judge's supervisor to complain about his performance and professionalism in a pending matter in an ongoing court-martial and to make the government's strong desires known, all in an apparent attempt to influence the proceedings. This action by the SJA caused the military judge to "think twice" about his actions in denying the government's prior requests.

A few hours later, the military judge received a motion from the government, asking again that he convene an Article 39(a), UCMJ, session. This time, the military judge granted the government's request. During his testimony, he explained he was exasperated and "basically threw up my hands and thought to myself well, if you really want it that bad, fine. We will go on the record and unless there is anything new, I will simply put on the record that I am denying the request because apparently my electronic [denials] two times [were] not sufficient, and therefore we are just going to get this done with on the record." The military judge stated that his supervisor's call was a factor in his decision to grant the defense motion and constituted "the straw that broke the camel's back."

As the military judge then drove to the base where the Article 39(a), UCMJ, session would be conducted, he thought further about the issue and was "a little concerned" that his rater had been contacted to complain about an ongoing ruling. He now wondered whether he had granted the government's request because he thought it was the right thing to do or because he was frustrated about how this situation had evolved. This caused him to question whether he should recuse himself from the case. He recognized, however, that the lengthy continuance that appeared imminent in the case would effectively remove him as the military judge due to an upcoming permanent change of station that would end his judicial duties. The military judge decided to hold

the Article 39(a), UCMJ, session and then include information about his supervisor's phone call in his continuance ruling. Although some language in that ruling appeared to suggest otherwise, the military judge testified that he had no intention of remaining on the case and would have recused himself if the trial was able to proceed before he left his judicial duties. He described himself as concerned and unhappy with the way this issue had evolved and that he did not believe it was appropriate for the SJA to make contact with his supervisor.

Just prior to entering the courtroom for the Article 39(a), UCMJ session, the military judge attempted to call the chief trial judge for the Air Force (who was also his senior rater) to explain what was happening. He ended up speaking to the deputy chief trial judge, who informed him that the SJA had attempted to contact the chief trial judge earlier that day. Knowing that his senior rater had been contacted by the SJA made the military judge even more concerned.

At the 10 May 2013 Article 39(a), UCMJ, session, the government again asked the military judge to engage in a discussion with the appellant about his choice of counsel and the ramifications of continuing with his current counsel. Trial counsel also indicated the government's concern that the defense had made indirect requests for release from pretrial confinement or had raised speedy trial issues under Article 10, UCMJ. Defense counsel restated that the accused had been advised of the likely delay due to the schedule of his current counsel and defense expert and that he would remain in pretrial confinement. Defense counsel objected to any questioning of the accused by the military judge as she considered it an unnecessary intrusion into attorney-client privilege. Defense counsel also stated the defense was not currently asking for release from pretrial confinement.

When trial counsel continued to express concern that the defense would later raise an Article 10, UCMJ, issue, especially if replacement counsel were assigned, the military judge pointed out that the defense had already represented several times that the appellant was "fine" with a delay in his trial because he wanted to keep his counsel. The military judge refused to directly ask the appellant about his discussion with counsel or if he was waiving his rights. He also declined to give a preliminary ruling on whether sufficient grounds existed for an Article 10, UCMJ, claim but noted it would become increasingly difficult for the defense to successfully raise one when the defense acknowledged it was the reason for the delay and where the government indicated it was prepared to go to trial immediately. Defense counsel stated she recognized this but expressly asserted the appellant was not waiving his speedy trial rights at that point. When trial counsel asked the military judge to assist in exploring possibilities to move up the trial date by clearing the defense expert's schedule or moving the case to defense counsel's base, the military judge declined but noted the parties were free to explore those options. He told the parties there would be a military judge available whenever the trial date was set.

In his written ruling on the continuance, issued on 15 May 2013, the military judge summarized the events described above, including the telephone call he received from the CRMJ and his knowledge of the SJA's phone call to the chief trial judge. He then set the trial date for 7 October 2013. He took no action to recuse himself from the case. The next day, the chief trial judge detailed a new military judge to the case because the original judge would not be available due to his pending July 2013 transfer from judicial duties.[8]

Following litigation of the unlawful command influence motion on 20–21 June 2013 and the new military judge's denial of that motion, the appellant pled guilty to most of the charged offenses and was sentenced.[9] He continues to aver that there was an appearance of unlawful command influence on appeal, arguing the charges should be dismissed based on the actions of the SJA, the CRMJ, and the chief trial judge.

*Waiver of Unlawful Command Influence*

On 31 May 2013, the appellant entered into a pretrial agreement that included an agreement that he would "waive all waivable motions." At an R.C.M. 802 session held shortly before the 20 June 2013 session, trial counsel informed the new military judge that the government's position was that this provision of the pretrial agreement precluded the appellant from filing the unlawful command influence motion, but the government was not going to withdraw from the pretrial agreement and had decided to allow the defense to make the motion.

After the military judge denied the defense's unlawful command influence motion, the appellant pled guilty to most of the offenses, in accordance with his pretrial agreement. Partway through the guilty plea inquiry, trial counsel asked the military judge to cover the waiver issue with the appellant relative to the unlawful command influence motion. In response, the military judge told the appellant he had expressly not ruled on whether the motion was waivable since the government had not objected to the defense litigating the motion. He also advised the appellant that it was possible an appellate court would find the motion waived by his guilty plea. Acknowledging this risk, the appellant elected to proceed with his guilty plea.[10]

---

[8] This replacement judge was subsequently replaced with the chief regional military judge (CRMJ) who made the phone call to the original military judge. When the CRMJ realized he had been detailed to this particular case and recalled his prior involvement, he recused himself and a third replacement judge was detailed by the chief trial judge. This replacement judge heard evidence regarding the unlawful command influence issue and also presided over the appellant's guilty plea and sentencing. Of the replacement judges, only this third replacement judge performed any substantive duties in the case.

[9] This session of the court-martial convened at Sheppard Air Force Base in order to accommodate the travel restrictions of one of the appellant's detailed defense counsel. The appellant's other defense counsel was released from representation of the appellant due to his imminent transfer overseas.

[10] The appellant reiterated that position in a post-trial Article 39(a), UCMJ, session convened on 15 October 2013 in order to address several issues relating to entry of pleas and to recreate a portion of the court-martial that was inadvertently not recorded due to a mechanical problem.

When later discussing the "waive all waivable motions" provision, the military judge explained it meant the appellant would be giving up the right to have an appellate court review any motions which by law are given up when an accused pleads guilty. Defense counsel and the military judge then discussed the motions the defense intended to raise if this provision did not exist or if the case was litigated. The unlawful command influence motion was not mentioned as part of that discussion.[11]

The government now argues that the appellant has waived appellate review of this issue. When an appellant has intentionally relinquished or abandoned a known right at trial, "it is extinguished and may not be raised on appeal." *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) (citing *United States v. Harcrow*, 66 M.J. 154, 156 (C.A.A.F. 2008)). As this court pointed out in a recent decision, our superior court to date has not applied waiver to issues of unlawful command influence arising during the adjudicative process, as it has for those arising during the accusatorial process. *See United States v. Dundon*, ACM 38436, unpub. op at 5 n.5, 5–6 (A.F. Ct. Crim. App. 27 February 2015), *review denied*, ___ M.J. ___ No. 15-0511/AF (Daily Journal 2 June 2015).[12] As we did in that case, we decline to find waiver here. Given our superior court's precedent, we find the appellant could not waive the issue of unlawful command influence relative to the military judge originally assigned to his case. This result is especially appropriate where, as here, the military judge advised the appellant that it was possible his unlawful command influence motion could, in fact, be reviewed on appeal.

### Unlawful Command Influence

Article 37, UCMJ, 10 U.S.C. § 837, states, "No person subject to [the UCMJ] may attempt to coerce or, by any unauthorized means, influence the action of a court-martial . . . or any member thereof . . . ." Unlawful command influence is "'the mortal enemy of military justice.'" *United States v. Gore*, 60 M.J. 178, 178 (C.A.A.F. 2004) (quoting *United States v. Thomas*, 22 M.J. 388, 393 (C.M.A. 1986)).

"Allegations of unlawful command influence are reviewed de novo." *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013) (citing *United States v. Harvey*, 64 M.J. 13, 19 (C.A.A.F. 2006)). When an "issue of unlawful command influence is litigated on the record, the military judge's findings of fact are reviewed under a clearly-erroneous standard, but the question of command influence flowing from those facts is a question of law that [we] review[] de novo." *United States v. Reed*,

---

[11] The waived motions included motions for appropriate relief due to entrapment, speedy trial violations, illegal pretrial punishment, and motions to compel certain discovery and experts.

[12] In *Dundon*, we declined to find waiver and noted that this issue would be particularly appropriate for certification by the Judge Advocate General under Article 67(a)(2), UCMJ, 10 U.S.C. § 867(a)(2), in view of (1) the potential inconsistency between the Court of Appeals' precedents on waiver and adjudicative unlawful command influence; and (2) the importance of clear guidance to military courts and the service members who appear before them. *Id.* at 2 n.1. The Judge Advocate General did not certify the waiver issue to our superior court in that case.

65 M.J. 487, 488 (C.A.A.F. 2008). Once actual or apparent command influence is properly placed at issue, "no reviewing court may properly affirm findings and sentence unless it is persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence." *Thomas*, 22 M.J. at 394.

The defense has the initial burden of raising the issue of unlawful command influence by presenting "some evidence" of unlawful command influence, meaning the defense must "show facts which, if true, constitute unlawful command influence." *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999); *Salyer*, 72 M.J. at 423. This "burden of showing potential unlawful command influence is low, but is more than mere allegation or speculation." *Salyer*, 72 M.J. at 423 (citing *United States v. Stoneman*, 57 M.J. 35, 41 (C.A.A.F. 2002). If raised on appeal, he must show (1) facts which, if true, constitute unlawful command influence; (2) the proceedings were unfair; and (3) the unlawful command influence was the cause of that unfairness. *Salyer*, 72 M.J. at 423; *Biagase*, 50 M.J. at 150. The burden then shifts to the government, who must prove beyond a reasonable doubt: (1) the predicate facts do not exist; or (2) the facts do not constitute unlawful command influence; or (3) the unlawful command influence did not affect the findings and sentence. *Biagase*, 50 M.J. at 151.

We review not only for actual unlawful command influence but also for the appearance of unlawful command influence. *United States v. Lewis,* 63 M.J. 405, 415 (C.A.A.F. 2006). "Even if there was no actual unlawful command influence, there may be a question whether the influence of command placed an 'intolerable strain on public perception of the military justice system.'" *Id.* (quoting *Stoneman*, 57 M.J. at 42–43). The mere appearance of unlawful command influence may be "as devastating to the military justice system as the actual manipulation of any given trial." *United States v. Allen*, 33 M.J. 209, 212 (C.M.A. 1991).

In his brief, the appellant argues the SJA created the appearance of unlawful command influence by trying to influence the court-martial through his calls to the military judge's supervisors. Our superior court has previously criticized government representatives who express their displeasure with a military judge's ruling during ex parte communications with the military judge's supervisor while he is still presiding over the court-martial. *Salyer*, 72 M.J. at 425–26. Unlike in this case, however, the government representatives in *Salyer* made that phone call as part of a broader government effort to disqualify the military judge from further participation in the case based on disagreements with the military judge's substantive rulings. *Id.* at 427. Here, there is no evidence of any intent to have the military judge removed. To the contrary, the government's stated goal was to get the appellant's court-martial underway as soon as possible, which, if achieved, would have resulted in the same military judge presiding over the trial. If that was not possible and the trial had to occur in October 2013, the government wanted to get certain information on the record before the current military judge ended his judicial duties on the case.

To that end, the SJA explained to both supervisory judges that he was only calling them for assistance regarding the "procedural issue of scheduling an Article 39(a)" and that he was not calling to complain about the military judge or about any substantive issues that may arise in that session.[13] In his testimony, the SJA repeatedly stated that he was sensitive to the potential for unlawful command influence in such a situation and told the supervisory judges he only wanted their assistance in getting the Article 39(a), UCMJ, session scheduled if that was permissible within the rules.[14] Based on the SJA's own experience as a military judge, the SJA believed such conversations between trial and supervisory judges were not inappropriate if they involved nonsubstantive matters, and he assumed the CRMJ would conduct the call in a permissible manner. The SJA stated he did not involve defense counsel in these discussions because he considered it to simply be a scheduling matter.

In his testimony, the CRMJ said his perception during the call was that the SJA wanted him to call the military judge to reiterate the government's position, but the CRMJ decided not to do that. Instead, he decided to call the military judge simply to get his version of the facts so he could engage in a more informed conversation with the SJA. When he spoke to the military judge, the CRMJ told him the SJA seemed frustrated with what the CRMJ paraphrased as the military judge being recalcitrant regarding the scheduling of an Article 39(a), UCMJ, session. The CRMJ intended this to be a sarcastic overstatement, designed to put the military judge at ease and demonstrate that the CRMJ was not making a judgment on the decision. Unfortunately, the military judge took the comment literally and did not perceive it as a joke. The CRMJ testified that he was careful not to criticize the military judge's ruling or attempt to influence his decision-making, but he did not tell the military judge this outright. They ended the call with the CRMJ saying that all that was left to do in the case was to re-docket it and that an Article 39(a), UCMJ, session was not needed for that. In hindsight, the CRMJ believed this conversation could be perceived as having made him a conduit through which the SJA could influence the decision of the military judge.

The CRMJ then called the SJA back and advised him that it did not appear an Article 39(a), UCMJ, session would be ordered. The SJA replied that it would be inappropriate for them to do anything further as that could interfere with the judge's independent decision. The CRMJ sent an e-mail to the chief trial judge, copying the SJA on the e-mail, which provided some background information on the issue and summarized his conversation with the military judge about why he had not ordered the

---

[13] Prior to making the call to the chief trial judge, the staff judge advocate (SJA) discussed the matter with the SJA for the general court-martial convening authority and the SJA for Air Education and Training Command. According to the SJA, both attorneys concurred with his decision to call the chief trial judge for assistance in getting the Article 39(a), UCMJ, session scheduled.

[14] Because he was overseas, the chief trial judge redirected the SJA to the CRMJ for the relevant region.

court session.[15]

In the meantime, believing that an Article 39(a), UCMJ, session would not be ordered, the SJA directed trial counsel to file a motion for an Article 39(a), UCMJ, session in order to demonstrate to a future military judge that the government had done what it could to preserve the record.[16]

Unfortunately, this effort to get the parties on the record in an Article 39(a), UCMJ, session created a very precarious situation that was fraught with the danger of inappropriate influence—apparent or actual—once the military judge learned about the phone calls that the SJA had made to his two raters, regardless of the subjective intentions of the participants in those calls.

The series of events in this case had the potential to unlawfully influence the military judge by affecting the military judge's performance, including how he conducted trial proceedings, how he made decisions and what decisions he made, as well as causing him to recuse himself from the court-martial. *See Salyer*, 72 M.J. at 415. Here, as the military judge explained in his testimony, once he became aware the SJA had called his supervisors about a matter pending before him and then received another request for an Article 39(a) session from trial counsel, he reacted by changing his mind and granting the government's request for a session despite multiple prior denials.[17] He then began second-guessing his reasons for that decision almost as soon as he made it. He also questioned the appropriateness of remaining as the military judge on the case. Once the session began, however, the military judge did not further yield to the government's demands and resisted its efforts to engage in substantive discussions during that session.

---

[15] The CRMJ was in no way obligated to report his conversation with the military judge, or its details, to the SJA. Moreover, the CRMJ's conversation with the military judge was protected by the privilege governing judicial communications. "[J]udges, like Presidents, depend upon open and candid discourse with their colleagues and staff to promote the effective discharge of their duties. . . . Confidentiality helps protect judges' independent reasoning from improper outside influences. It also safeguards legitimate privacy interests of both judges and litigants." *United States Navy-Marine Corps Court of Military Review v. Carlucci*, 26 M.J. 328, 337 (C.M.A. 1988) (quoting *Matter of Certain Complaints Under Investigation*, 783 F.2d 1488, 1519–20 (11th Cir. 1986)). We further note that our superior court has explicitly barred "official inquiries outside the adversary process which question or seek justification for a judge's decision unless such inquiries are made by an independent judicial commission established in strict accordance with the [ABA] guidelines." *United States v. Ledbetter*, 2 M.J. 37, 43 (C.M.A. 1976). It appears such a quasi-official inquiry occurred in this court-martial when the CRMJ asked questions of the trial judge based on the SJA's inquiry and then reported the judge's responses back to the SJA.

[16] This is the motion the military judge ultimately granted, as described above.

[17] We note that this situation could have been avoided if the military judge's supervisors had affirmatively told the SJA that they would not engage with the military judge regarding his ruling in a pending court-martial and had declined to report back to him with the information they gathered from the military judge for their own situational awareness. Even such benign information gathering conversations with a trial judge, however, run the risk of improperly affecting the judge's performance, or creating the appearance the military judge is not independent. As the CRMJ discovered here, the risk is heightened when the trial judge is being questioned about an ongoing litigation issue in a pending court-martial.

In light of this, the appellant does not contend any actual unlawful command influence occurred when the military judge reacted to the phone calls by ordering the Article 39(a), UCMJ, session, and he does not allege he suffered any prejudice as a result of that session or after a replacement judge was detailed. Instead, he argues the actions of the phone call participants created the appearance of such improper influence. The appellant argues that a reasonable member of the public would be left with the impression that government representatives in a trial have the power to affect the rulings of a military judge by contacting the judge's chain of command, leading the public to perceive the military justice system as unfair. *See Salyer*, 72 M.J. at 427.

We find the appellant met his initial burden of presenting some evidence of apparent unlawful command influence. This is an issue that is evaluated objectively with the focus on the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public. *Lewis*, 63 M.J. at 415. An appearance of unlawful command influence will exist "where an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." *Id.*

As the replacement military judge found at trial, the SJA's phone calls to the chief trial judge and the CRMJ were made in an effort to have them assist in changing a ruling made by the sitting military judge, and these calls played a part in the military judge's decision to hold the Article 39(a), UCMJ, session. We recognize this ruling related to whether to schedule a court session, as opposed to a substantive ruling on a legal issue. That distinction, however, does not make the ruling subject to modification through the process employed here.[18] When the government disagrees with the rulings of a trial judge, it may seek reconsideration, file motions with the trial judge, or seek this court's involvement through government appeals under Article 62, UCMJ, 10 U.S.C. § 862, or through extraordinary writs.

As our superior court has expressly stated, the normative process in challenging a ruling does not include having "the Government communicate in an ex parte manner with the military judge's judicial supervisor and express displeasure with the ruling." *Salyer*, 72 M.J. at 426. Such a process can essentially create, or appear to create, a backchannel ex parte review of a military judge's ruling through the use of supervisory judges as an

---

[18] In reaching this conclusion, we reject the government's claim on appeal that the SJA's actions could not constitute any evidence of unlawful command influence because he was simply seeking assistance in scheduling a court session that the government was entitled to have and that the military judge was required to conduct. In making this claim, the government argues that the military judge was required to conduct the Article 39(a), UCMJ, session based on R.C.M. 905(h) and the decision in *United States v. Savard*, 69 M.J. 211, 212 (C.A.A.F. 2010) (holding that a military judge errs if he denies a party's request to hold an Article 39(a), UCMJ, session concerning the disposition of a written motion). Because the military judge allegedly had no discretion in whether to convene a session, the government argues there was no problem with the SJA's efforts to get the session scheduled. Notably, however, the government never cited these authorities to the military judge, and the SJA did not refer to them during the telephone calls.

informal quasi-appellate court system. To permit this "would foster the 'intolerable strain of public perception' on the military justice system which the proscription against unlawful command influence and this Court guard against." *Id.* at 427. To that end, our superior court has condemned communications to a military judge's judicial superiors regarding his performance, noting that "[p]art of the trade-off in a system in which judges lack tenure and professionally survive only by grace . . . is special vigilance to assure judicial independence." *United States v. Campos*, 42 M.J. 253, 260 (C.A.A.F. 1995).

However, even if the appearance of unlawful command influence was created by the circumstances that led the military judge to convene the Article 39(a), UCMJ, session, we can find it harmless beyond a reasonable doubt if the government convinces us that the disinterested public would believe the appellant received a trial free from the effects of unlawful command influence. *Lewis*, 63 M.J. at 415. That is the case here.

Once he convened the Article 39(a), UCMJ, session, the military judge did not change any of his prior rulings and he continued to support defense counsel's positions. Although the government facially achieved its overall goal of having an Article 39(a), UCMJ, session, the military judge's continued refusal to engage in substantive discussions with the appellant at that session or engage in the other discussions requested by the government frustrated its plan to use this session to add to the record, leaving the appellant in the same position as before the session was convened. The government therefore received no advantage from its successful efforts to have an Article 39(a), UCMJ, session. *Cf. Salyer*, 72 M.J. at 428 (finding that government failed to meet its burden when an objective member of the public would have the impression that the government obtained an advantage).

Additionally, the appellant elected to plead guilty before another military judge, and he has raised no issue on appeal about the fairness or propriety of that proceeding or its results.[19] Before making that decision, the appellant had the benefit of a fact finding hearing where the relevant parties discussed the events that led to the allegations of unlawful command influence. *See Campos*, 42 M.J. at 261 (noting that the full and open litigation of an unlawful command influence motion can fully dispel an appearance of unlawful command influence). He also was assured by the replacement military judge that he would not be influenced by any of the events that had occurred in the case before he was detailed to it, and we find that assurance to be fully consistent with the record of the litigation. *See id.* (finding a military judge's assurances that he would not be affected by the unlawful command influence events can establish beyond a reasonable doubt that

---

[19] We also note that the military judge in this case did not recuse himself based on the government's actions. Instead, he was replaced on this case based on his decision to grant a lengthy defense-requested continuance over government objection. We contrast this to the facts in *United States v. Salyer*, 72 M.J. 415, 423 (C.A.A.F. 2013), where the appellant was denied his right to a timely trial with a properly detailed military judge due to the government's inappropriate actions. Here the military judge was replaced because he granted the defense-requested continuance and his previously scheduled duty rotation.

his performance was not affected by the issue).  There is also no evidence or allegation that the switch to a replacement judge caused the appellant to lose any "defense-friendly" rulings made by the original judge.  *See Salyer*, 72 M.J. at 428.

Under the totality of these circumstances, we conclude an objective, disinterested public would believe the appellant received a trial that ultimately was free from the effects of any unlawful command influence stemming from the actions of the phone call participants and thus would not harbor a significant doubt about the fairness of the appellant's court-martial.  We are therefore convinced that "the appearance of command influence has been ameliorated and made harmless beyond a reasonable doubt." *See Lewis*, 63 M.J. at 415-16.

### *Conclusion*

The approved findings and sentence are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred.  Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).  Accordingly, the approved findings and sentence are **AFFIRMED**.

FOR THE COURT

STEVEN LUCAS
Clerk of the Court